# TRANSCONTINENTAL GAS PIPE LINE CORP. *v.* STATE OIL AND GAS BOARD OF MISSISSIPPI ET AL.

No. 84–1076.   Argued October 8, 1985—Decided January 22, 1986

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and MARSHALL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which POWELL, STEVENS, and O'CONNOR, JJ., joined, *post*, p. 425.

*John Marshall Grower* argued the cause for appellant. With him on the briefs were *Jefferson D. Stewart, R. Wilson Montjoy II, R. V. Loftin, Jr.,* and *Thomas E. Skains.*

*Jerome M. Feit* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Lee, William H. Satterfield, Joseph S. Davies,* and *John H. Conway.*

*Ed Davis Noble, Jr.,* Assistant Attorney General of Mississippi, argued the cause for appellee State Oil and Gas Board of Mississippi. With him on the brief were *Edwin Lloyd Pittman,* Attorney General, and *R. Lloyd Arnold,* Assistant Attorney General. *Glenn Gates Taylor* argued the cause for appellee Coastal Exploration, Inc. With him on the brief was *Kenneth I. Franks. Walker L. Watters* and *David T. Cobb* filed a brief for appellee Getty Oil Co.*

---

*Briefs of *amici curiae* urging reversal were filed for the Interstate Natural Gas Association of America by *Harold L. Talisman* and *John H. Cheatham III;* and for Associated Gas Distributors by *Frederic Moring.*

Briefs of *amici curiae* urging affirmance were filed for the State of Texas by *Jim Mattox,* Attorney General, *David R. Richards,* Executive Assist-

JUSTICE BLACKMUN delivered the opinion of the Court.

We are confronted again with the issue of a state regulation requiring an interstate pipeline to purchase gas from all the parties owning interests in a common gas pool. The purchases would be in proportion to the owners' respective interests in the pool, and would be compelled even though the pipeline has pre-existing contracts with less than all of the pool's owners.

This Court, in *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S. 84 (1963), struck down, on pre-emption grounds, a virtually identical regulation. In the present case, however, the Supreme Court of Mississippi ruled that the subsequently enacted Natural Gas Policy Act of 1978 (NGPA), 92 Stat. 3351, 15 U. S. C. § 3301 *et seq.*, effectively nullified *Northern Natural* by vesting regulatory power in the States over the wellhead sale of gas. The Mississippi Supreme Court went on to hold that the Mississippi regulation did not impermissibly burden interstate commerce. Because of the importance of the issues in the functioning of the interstate market in natural gas, we noted probable jurisdiction. 470 U. S. 1083 (1985).

I

The Harper Sand gas pool lies in Marion County in southern Mississippi. Harper gas is classified as "high-cost natural gas" under NGPA's § 107(c)(1), 15 U. S. C. § 3317(c)(1), because it is taken from a depth of more than 15,000 feet. At the time of the proceedings before appellee State Oil and Gas Board of Mississippi, six separate wells drew gas from the pool. A recognized property of a common pool is that, as gas is drawn up through one well, the pressure surrounding

ant Attorney General, and *Larry J. Laurent* and *Manual Rios*, Assistant Attorneys General; and for the National Governors' Association by *Benna Ruth Solomon* and *Joyce Holmes Benjamin*.

*David Crump* filed a brief for the Legal Foundation of America as *amicus curiae*.

that well is reduced and other gas flows towards the area of the producing well. Thus, one well can drain an entire pool, even if the gas in the pool is owned by several different owners. The interests of these other owners often are referred to as "correlative rights." See, *e. g.*, Miss. Code Ann. § 53–1–1 (1972 and Supp. 1985).

Some owners of interests in the Harper Sand pool, such as appellee Getty Oil Co., actually drill and operate gas wells. Others, such as appellee Coastal Exploration, Inc., own smaller working interests in various wells. Normally, these lesser owners rely on the well operators to arrange the sales of their shares of the production, see App. 26, although some nonoperator owners contract directly either with the pipeline that purchases the operator's gas or with other customers.

Appellant Transcontinental Gas Pipe Line Corporation (Transco) operates a natural gas pipeline that transports gas from fields in Texas, Louisiana, and Mississippi for resale to customers throughout the Northeast. Beginning in 1978, Transco entered into 35 long-term contracts with Getty and two other operators, Florida Exploration Co. and Tomlinson Interests, Inc., to purchase gas produced from the Harper Sand pool. In line with prevailing industry practice, the contracts contained "take-or-pay" provisions. These essentially required Transco either to accept currently a certain percentage of the gas each well was capable of producing, or to pay the contract price for that gas with a right to take delivery at some later time, usually limited in duration. Take-or-pay provisions enable sellers to avoid fluctuations in cash flow and are therefore thought to encourage investments in well development. See Pierce, Natural Gas Regulation, Deregulation, and Contracts, 68 Va. L. Rev. 63, 77–79 (1982).

Transco entered into these contracts during a period of national gas shortage. Transco's contracts with Getty and Tomlinson obligated it to buy only Getty's and Tomlinson's own shares of the gas produced by the wells they operated,

while its contracts with Florida Exploration required it to take virtually all the gas Florida Exploration's wells produced, regardless of its ownership. See App. 107. But demand was sufficiently high that Transco also purchased, on a noncontract basis, the production shares of smaller owners, such as Coastal, in the Getty and Tomlinson wells. *Id.*, at 155. In the spring of 1982, however, consumer demand for gas dropped significantly, and Transco began to have difficulty selling its gas. It therefore announced in May 1982 that it would no longer purchase gas from owners with whom it had not actually contracted. See, *e. g.*, *id.*, at 41–42. Transco refused Coastal's request that it be allowed to ratify Getty's contract, and made a counteroffer, which Coastal refused, either to purchase Coastal's gas at a significantly lower price than it was obligated to pay under its existing contracts or to transport Coastal's gas to other customers if Coastal arranged such sales. See *id.*, at 66–69. Fifty-five other noncontract owners of Harper gas, however, did accept such offers from Transco. See 457 So. 2d 1298, 1309 (Miss. 1984).

Getty and Tomlinson cut back production so that their wells produced only that amount of gas equal to their ownership interests in the maximum flow. The immediate economic effect of the cutback was to deprive Coastal of revenue, because none of its share of the Harper gas was being produced. The ultimate geological effect, however, is that gas will flow *from* the Getty-Tomlinson areas of the field, which are producing at less than capacity, *to* the Florida Exploration areas; gas owned by interests that produce through Getty's and Tomlinson's wells thus may be siphoned away. Moreover, because of the decrease in pressure, gas left in the ground, such as Coastal's gas, may become more costly to recover and therefore its value at the wellhead may decline.

## II

On July 29, 1982, Coastal filed a petition with appellee State Oil and Gas Board of Mississippi, asking the Board to enforce its Statewide Rule 48, a "ratable-take" requirement. Rule 48 provides:

"Each person now or hereafter engaged in the business of purchasing oil or gas from owners, operators, or producers shall purchase without discrimination in favor of one owner, operator, or producer against another in the same common source of supply."

Rule 48 never before had been employed to require a pipeline actually to purchase noncontract gas; rather, its sole purpose appears to have been to prevent drainage, that is, to prevent a buyer from contracting with one seller and then draining a common pool of all its gas. See 457 So. 2d, at 1306. The Gas Board conducted a 3-day evidentiary proceeding. It found Transco in violation of Rule 48, and, by its Order No. 409–82, filed Oct. 13, 1982,[1] ordered Transco to start taking gas "ratably" (i. e., in proportion to the various owners' shares) from the Harper Sand pool, and to purchase the gas under nondiscriminatory price and take-or-pay conditions.

Transco appealed the Gas Board's ruling to the Circuit Court of the First Judicial District of Hinds County, Miss. In the parts of its opinion relevant to this appeal, the Circuit Court held that the Gas Board's authority was not pre-

---

[1] Order No. 409–82 directed Transco "forthwith to comply with Statewide Rule 48 of the State Oil and Gas Board of Mississippi in its purchases of gas from the said Harper Sand Gas Pool in Greens Creek and East Morgantown Fields, and . . . ratably take and purchase gas without discrimination in favor of one owner, operator or producer against another in the said common source of *[sic]* pool; and, specifically, in the event it so chooses and elects to take and purchase gas produced from the said common pool, Transco shall ratably take and purchase without discrimination in favor of the operators Getty and Tomlinson against Coastal, the Fairchilds, and Inexco." App. to Pet. for Cert. 112a.

empted by either the Natural Gas Act of 1938 (NGA), ch. 556, 52 Stat. 821, 15 U. S. C. § 717 *et seq.*, or the NGPA; that the NGPA effectively overruled *Northern Natural;* and that the Gas Board's order did not run afoul of the Commerce Clause of the United States Constitution.

The Mississippi Supreme Court affirmed that portion of the Circuit Court's judgment. 457 So. 2d 1298 (1984). With respect to Transco's pre-emption claim, the court recognized that, prior to 1978, the Federal Energy Regulatory Commission (FERC) and its predecessor, the Federal Power Commission, possessed "plenary authority to regulate the sale and transportation of natural gas in interstate commerce." *Id.*, at 1314. Under the interpretation of that authority in *Northern Natural*, where a Kansas ratable-take order was ruled invalid because the order "invade[d] the exclusive jurisdiction which the Natural Gas Act has conferred upon the Federal Power Commission," 372 U. S., at 89, Mississippi's "authority to enforce Rule 48 requiring ratable taking had been effectively suspended—preempted, if you will, and any orders such as Order No. 409–82 would have been wholly unenforceable." 457 So. 2d, at 1314. But the court went on to conclude that the enactment of the NGPA in 1978 removed FERC's jurisdiction over "high-cost" gas (the type produced from the Harper Sand pool). Under § 601(a)(1) of the NGPA, "the Natural Gas Act of 1938 (NGA) and FERC's jurisdiction under the Act *never* apply to deregulated gas" (emphasis added), 457 So. 2d, at 1316, and "[t]hat message is decisive of the preemption issue in this case." *Ibid.*

The court also found no implicit pre-emption of Rule 48. Transco's compliance with the Rule could not bring it into conflict with any of FERC's still-existing powers over the gas industry. The court noted that, under *Arkansas Electric Cooperative Corp.* v. *Arkansas Public Service Comm'n*, 461 U. S. 375, 384 (1983), a federal determination that deregulation was appropriate was entitled to as much weight in determining pre-emption as a federal decision to regulate actively.

Although the NGPA stemmed from Congress' desire to deregulate the gas industry, the court found that "[h]owever consistent a continued proscription on state regulation might have been with the theoretical underpinnings of deregulation, the Congress in NGPA in 1978 did not ban state regulation of deregulated gas." 457 So. 2d, at 1318.

In addressing the Commerce Clause issue, the court relied on the balancing test set out in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970): when a state law "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*, at 142. In weighing the benefit against the burden, a reviewing court should consider whether the local interest "could be promoted as well with a lesser impact on interstate activities." *Ibid.* The court found that Rule 48 had a legitimate local purpose—the prevention of unfair drainage from commonly owned gas pools. It identified the principal burden on interstate commerce as higher prices for the ultimate consumers of natural gas. But, under *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.*, 340 U. S. 179, 186–187 (1950), higher prices do not render a state regulation impermissible *per se* under the Commerce Clause. Also, Congress expressed a clear intent in enacting the NGPA that "all reasonable costs of production of natural gas shall be borne ultimately by the consumer. . . . Congress within the scope of its power under the affirmative Commerce Clause has expressly authorized such increases." 457 So. 2d, at 1321. Transco had identified one other potential burden on interstate commerce: Rule 48 would require it to take more gas from Mississippi's fields than would otherwise be the case, thereby leading Transco to reduce its purchases from Louisiana and Texas. But the Mississippi court rejected this argument, noting both that Texas and Louisiana had their own ratable-take regulations, which presumably would protect

their producers, and that the actual cause of any such effect was Transco's imprudent entry into take-or-pay contracts, rather than the State's ratable-take requirement. Transco knew of Rule 48's existence when it entered into its various contracts and should have foreseen the risk that it would be required to purchase smaller owners' shares. Moreover, since Transco was permitted to pass along its increased costs, the consumer ultimately would bear this burden, which was "simply one inevitable consequence of the free market policies of the era of deregulation with respect to which Transco is vested by the negative Commerce Clause with no right to complain." *Id.*, at 1322.

Finally, the court rejected Transco's argument that the State could have served the same local public interest through a ratable-production order rather than through a ratable-take order. It held that it need not even consider whether less burdensome alternatives to the ratable-take order existed, because Transco had failed to meet the threshold requirement of demonstrating an unreasonable burden on interstate commerce.[2]

### III

If the Gas Board's action were analyzed under the standard used in *Northern Natural*, it clearly would be pre-empted. Whether that decision governs this case depends on whether Congress, in enacting the NGPA, altered those characteristics of the federal regulatory scheme which provided the basis in *Northern Natural* for a finding of pre-emption.

---

[2] Transco's other claims, a void-for-vagueness challenge, a Takings Clause argument, and various state-law claims, were rejected with one exception. The court found that, although the Gas Board had the power to order Transco to take ratably from the Harper Sand pool, it lacked the power to prohibit Transco from paying different prices for gas owned by nonparties to its original contracts. Therefore, Transco need pay Coastal only the current market price, rather than the higher price it was paying Getty and Tomlinson under its contracts with them.

In that case this Court considered whether the "comprehensive scheme of federal regulation" that Congress enacted in the NGA pre-empted a Kansas ratable-take order. 372 U. S., at 91. Northern Natural Gas Company had a take-or-pay contract with Republic Natural Gas Company to purchase all the gas Republic could produce from its wells in the Hugoton Field. Northern also had contracts with other producers to buy their production, but those contracts required it to purchase their gas only to the extent that its requirements could not be satisfied by Republic. *Id.*, at 87. Northern historically had taken ratably from all Hugoton wells, but, starting in 1958, it no longer needed all the gas the wells in the field were capable of producing. It therefore reduced its purchases from the other wells, causing drainage toward Republic's wells. The Kansas Corporation Commission, which previously had imposed a ratable-production order on the Hugoton producers,[3] then issued a ratable-take order requiring Northern to "take gas from Republic wells in no higher proportion to the allowables than from the wells of the other producers." *Id.*, at 88.

Kansas argued that its order represented a permissible attempt to protect the correlative rights of the other producers. The Court rejected this contention. Section 1(b) of the NGA, 15 U. S. C. § 717(b), provided that the Act's provisions "shall not apply . . . to the production or gathering of natural gas." But the Court, it was said, "has consistently held that 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." 372 U. S., at 90. Since Kansas' order was directed not at "a producer but

---

[3] A ratable-production order in essence allocates pro rata among interest owners the right to produce the amount of gas demanded. For example, if one interest owner owns 75% of the gas in a common pool with 100 units of gas and demand is 60 units, then the majority owner will be permitted to sell only 45 of his units, even though he owns, and is capable of producing, 75 units.

a purchaser of gas from producers," *ibid.*, Northern, being a purchaser, was not expressly exempted from the Act's coverage.

Although it was "undeniable that a state may adopt reasonable regulations to prevent economic and physical waste of natural gas," *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.*, 340 U. S., at 185, the Court did not view the ratable-take rule as a permissible conservation measure.[4] Such measures target producers and production, while ratable-take requirements are "aimed directly at interstate purchasers and wholesales for resale." *Northern Natural*, 372 U. S., at 94.

The Court identified the conflict between Kansas' rule and the federal regulatory scheme in these terms: Congress had "enacted a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" *Id.*, at 91, quoting *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672, 682 (1954). "[U]niformity of regulation" was one of its objectives. 372 U. S., at 91–92. And, it was said:

> "The danger of interference with the federal regulatory scheme arises because these orders are unmistakably and unambiguously directed at *purchasers* who take gas in Kansas for resale after transportation in interstate commerce. In effect, these orders shift to the shoulders of interstate purchasers the burden of performing the complex task of balancing the output of thousands of natural gas wells within the State . . . . Moreover, any readjustment of purchasing patterns which such orders

---

[4] The Court noted, 340 U. S., at 185, that it had "upheld numerous kinds of state legislation designed to curb waste of natural resources and to protect the correlative rights of owners through ratable taking, *Champlin Refining Co.* v. *Corporation Commission of Oklahoma*, 286 U. S. 210 (1932)," but it is clear from the context of that statement that those challenges had involved claims by gas owners under the Due Process and Equal Protection Clauses, rather than claims of federal pre-emption: "These ends have been held to justify control over production even though the uses to which property may profitably be put are restricted." *Id.*, at 185–186.

might require of purchasers who previously took unratably could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States" (emphasis in original). *Id.*, at 92.

*Northern Natural*'s finding of pre-emption thus rests on two considerations. First, Congress had created a comprehensive regulatory scheme, and ratable-take orders fell within the limits of that scheme rather than within the category of regulatory questions reserved for the States. Second, in the absence of ratable-take requirements, purchasers would choose a different, and presumably less costly, purchasing pattern. By requiring pipelines to follow the more costly pattern, Kansas' order conflicted with the federal interest in protecting consumers by ensuring low prices.

Under the NGA, the Federal Power Commission's comprehensive regulatory scheme involved "utility-type rate-making" control over prices and supplies. See Haase, The Federal Role in Implementing the Natural Gas Policy Act of 1978, 16 Houston L. Rev. 1067, 1079 (1979). The FPC set price ceilings for sales from producers to pipelines and regulated the prices pipelines could charge their downstream customers. But "[i]n the early 1970's, it became apparent that the regulatory structure was not working." *Public Service Comm'n of New York* v. *Mid-Louisiana Gas Co.*, 463 U. S. 319, 330 (1983). The Nation began to experience serious gas shortages. The NGA's "artificial pricing scheme" was said to be a "major cause" of the imbalance between supply and demand. See S. Rep. No. 95–436, p. 50 (1977) (additional views of Senators Hansen, Hatfield, McClure, Bartlett, Weicker, Domenici, and Laxalt).

In response, Congress enacted the NGPA, which "has been justly described as 'a comprehensive statute to govern future natural gas regulation.'" *Mid-Louisiana Gas. Co.*, 463 U. S., at 332, quoting Note, Legislative History of the Natu-

ral Gas Policy Act, 59 Texas L. Rev. 101, 116 (1980). The aim of federal regulation remains to assure adequate supplies of natural gas at fair prices, but the NGPA reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand. See S. Rep. No. 95–436, at 10. The new federal role is to "overse[e] a national market price regulatory scheme." Haase, 16 Houston L. Rev., at 1079; see S. Rep. No. 95–436, at 21 (NGPA implements "a new commodity value pricing approach"). The NGPA therefore does not constitute a federal retreat from a comprehensive gas policy. Indeed, the NGPA in some respects expanded federal control, since it granted FERC jurisdiction over the intrastate market for the first time. See the Act's §§ 311 and 312, 15 U. S. C. §§ 3371 and 3372.

Appellees argue, however, that §§ 601(a)(1)(B)(i) and (ii), 15 U. S. C. §§ 3431(a)(1)(B)(i) and (ii), stripped FERC of jurisdiction over the Harper Sand pool gas which was the subject of the Gas Board's Rule 48 order, thereby leaving the State free to regulate Transco's purchases. Section 601(a)(1)(B) states that "the provisions of [the NGA] and the jurisdiction of the Commission under such Act shall not apply solely by reason of any first sale" of high-cost or new natural gas. Moreover, although FERC retains some control over pipelines' downstream pricing practices, § 601(c)(2) requires FERC to permit Transco to pass along to its customers the cost of the gas it purchases "except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." According to appellees, FERC's regulation of Transco's involvement with high-cost gas can now concern itself only with Transco's sales to its customers; FERC, it is said, cannot interfere with Transco's purchases of new natural gas from its suppliers. Appellees believe that the Gas Board order concerns only this latter relationship, and therefore is not pre-empted by federal regulation of other aspects of the gas industry.

That FERC can no longer step in to regulate directly the prices at which pipelines purchase high-cost gas, however, has little to do with whether state regulations that affect a pipeline's costs and purchasing patterns impermissibly intrude upon federal concerns. Mississippi's action directly undermines Congress' determination that the supply, the demand, and the price of high-cost gas be determined by market forces. To the extent that Congress denied FERC the power to regulate affirmatively particular aspects of the first sale of gas, it did so because it wanted to leave determination of supply and first-sale price to the market. "[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive force as a decision *to* regulate" (emphasis in original). *Arkansas Electric Cooperative Corp.* v. *Arkansas Public Service Comm'n*, 461 U. S., at 384. Cf. *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 150–151 (1976).

The proper question in this case is not whether FERC has affirmative regulatory power over wellhead sales of § 107 gas, but whether Congress, in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the States the power it had denied FERC. The answer to the latter question must be in the negative. First, when Congress meant to vest additional regulatory authority in the States it did so explicitly. See §§ 503(c) and 602(a), 15 U. S. C. §§ 3413(c) and 3432(a). Second, although FERC may now possess less regulatory jurisdiction over the "intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States," *Northern Natural*, 372 U. S., at 92, than it did under the old regime, that relationship is still a subject of deep federal concern. FERC still must review Transco's pricing practices, even

though its review of Transco's purchasing behavior has been circumscribed. See App. 148–150, 170. In light of Congress' intent to move toward a less regulated national natural gas market, its decision to remove jurisdiction from FERC cannot be interpreted as an invitation to the States to impose additional regulations.

Mississippi's order also runs afoul of other concerns identified in *Northern Natural*. First, it disturbs the uniformity of the federal scheme, since interstate pipelines will be forced to comply with varied state regulations of their purchasing practices. In light of the NGPA's unification of the interstate and intrastate markets, the contention that Congress meant to permit the States to impose inconsistent regulations is especially unavailing. Second, Mississippi's order would have the effect of increasing the ultimate price to consumers. Take-or-pay provisions are standard industrywide. See Pierce, 68 Va. L. Rev., at 77–78; H. R. Rep. No. 98–814, pp. 23–25, 133–134 (1984). Pipelines are already committed to purchase gas in excess of market demand. Mississippi's rule will require Transco to take delivery of noncontract gas; this will lead Transco not to take delivery of contract gas elsewhere, thus triggering take-or-pay provisions. Transco's customers will ultimately bear such increased costs, see App. 161, unless FERC finds that Transco's purchasing practices are abusive. In fact, FERC is challenging, on grounds of abuse, the automatic passthrough of some of the costs Transco has incurred in its purchases of high-cost gas. See App. 177–178.[5] In any event, the federal scheme is dis-

---

[5] On October 31, 1985, FERC issued an initial decision, *Transcontinental Gas Pipe Line Corp.*, 33 FERC ¶ 63,026, finding that Transco's purchases of Harper Sand gas pursuant to the ratable-take order were not imprudent. But the grounds on which the Administrative Law Judge rested his conclusion demonstrate how Mississippi's action impermissibly interferes with FERC's regulatory jurisdiction.

FERC's staff had requested the judge to order Transco "to pursue a least-cost purchasing strategy *irrespective of Rule 48.*" *Id.*, at 65,073 (emphasis in original). The judge refused: "In my view, Transco is entitled,

rupted: if customers are forced to pay higher prices because of Mississippi's ratable-take requirement, then Mississippi's rule frustrates the federal goal of ensuring low prices most effectively; if FERC ultimately finds Transco's practices abusive and refuses to allow a passthrough, then FERC's and Mississippi's orders to Transco will be in direct conflict.

The change in regulatory perspective embodied in the NGPA rested in significant part on the belief that direct federal price control exacerbated supply and demand problems by preventing the market from making long-term adjustments.[6] Mississippi's actions threaten to distort the market once again by artificially increasing supply and price. Although, in the long run, producers and pipelines may be able to adjust their selling and purchasing patterns to take account of ratable-take orders, requiring such future adjustments in an industry where long-term contracts are the norm

---

indeed is required, to follow the decisions of the Mississippi authorities until and unless they be overturned by the Supreme Court of the United States." *Id.*, at 65,074.

Had the judge considered FERC's claim on the merits, the conflict between the federal and state schemes would be patent. But his belief that he was constrained to find Transco's practices reasonable because they were undertaken in compliance with Mississippi law is almost as demonstrative of pre-emption. First, Mississippi cannot be permitted to foreclose what would otherwise be more searching federal oversight of purchasing practices. Second, the mere exercise of federal regulatory power, even if it does not result in invalidation of the challenged act, shows continued federal occupation of the field. Since no evidence exists to suggest Congress intended FERC's power to be circumscribed by state action, Rule 48 is pre-empted.

[6] The dissent's complaint that Congress did not intend to decontrol supply and demand, *post*, at 433, n. 5, misses the point. Congress clearly intended to eliminate the distortive effects that NGA price control had had on supply and demand. To suggest that Congress was willing to replace this distortion with a distortion on price caused by a State's decision to require pipelines and, ultimately, interstate consumers, to purchase gas they do not want — the purpose of the order in this case — requires taking an artificially formalistic view of what Congress sought to achieve in the NGPA.

will postpone achievement of Congress' aims in enacting the NGPA. We therefore conclude that Mississippi's ratable-take order is pre-empted.

## IV

Because we have concluded that the Gas Board's order is pre-empted by the NGA and NGPA, we need not reach the question whether, absent federal occupation of the field, Mississippi's action would nevertheless run afoul of the Commerce Clause.

The judgment of the Supreme Court of Mississippi is therefore reversed.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE POWELL, JUSTICE STEVENS, and JUSTICE O'CONNOR join, dissenting.

Section 601(a)(1) of the Natural Gas Policy Act of 1978 (NGPA), 92 Stat. 3409, 15 U. S. C. § 3431(a)(1), removes the wellhead sales of "high-cost natural gas" from the coverage of the Natural Gas Act (NGA), 15 U. S. C. §§ 717–717w. Section 121(b) of the NGPA, 15 U. S. C. § 3331(b), exempts such gas from any lingering price controls under the NGPA. The Court nonetheless holds that Mississippi's application of its ratable-take rule to high-cost gas in order to "do equity between and among owners in a common pool of deregulated gas," App. to Juris. Statement 28a, is pre-empted by the NGA and NGPA. The Court's opinion misuses the pre-emption doctrine to extricate appellant Transcontinental Gas Pipe Line Corp. (Transco) from a bed it made for itself. I dissent because I do not believe that Mississippi's ratable-take rule invades the exclusive sphere of the NGA, conflicts with the NGPA's purpose of decontrolling the wellhead price of high-cost gas, or runs afoul of the implicit free market policy of the dormant Commerce Clause.

The imposition of a ratable-take rule is a familiar solution of oil and gas law to the problem of "drainage" in a commonly

owned gas pool.[1]  When several individuals own gas in a common pool, each has an incentive to remove and capture as much gas as rapidly as possible in order to prevent others from "draining away" his share of the gas reserves.  This practice results in a much faster removal rate than a single owner of the same pool would choose, and makes it more difficult to obtain the last amounts of gas in a pool.  A ratable-take rule eliminates the perverse incentives of common ownership that otherwise give rise to such economic waste and sharp practice.  See *Champlin Refining Co.* v. *Oklahoma Corporation Comm'n*, 286 U. S. 210, 233 (1932).

The controversy in this case centers around the Harper Sand Gas Pool (Harper Pool), which is a pool of "high-cost natural gas" within the definition of that term in § 107(c)(1) of the NGPA, 15 U. S. C. § 3317(c)(1), because it lies more than 15,000 feet beneath the ground and surface drilling for its gas began in 1978.[2]  By 1982, there were six wells drawing gas from the Harper Pool.  Three were operated by Getty Oil Co., two by the Florida Exploration Co., and one by Tomlinson Interests, Inc.  These operators were only part owners of the gas drawn up through their respective wells.

---

[1] The withdrawal of gas from a common pool causes changes in pressure, resulting in the migration and spreading out of the remaining gas over the entire pool.  This migration is called "drainage" because, from the viewpoint of each owner, the withdrawal of gas by another causes gas to migrate or "drain" away from his end of the pool.

[2] The NGPA defines "high-cost natural gas" as any gas

"(1) produced from any well the surface drilling of which began on or after February 19, 1977, if such production is from a completion location which is located at a depth of more than 15,000 feet;

"(2) produced from geopressured brine;

"(3) occluded natural gas produced from coal seams;

"(4) produced from Devonian shale; and

"(5) produced under such other conditions as the Commission determines to present extraordinary risks or costs."  NGPA § 107(c), 92 Stat. 3366, 15 U. S. C. § 3317(c).

They shared ownership rights with a large number of other parties including appellee Coastal Exploration, Inc.

Appellant Transco is an interstate pipeline company that purchases gas from the various owners of the Harper Pool. As each well was drilled between 1978 and 1982, Transco entered into long-term contracts with the well operators to ensure future gas supplies at a fixed price. In this way, Transco bound itself to purchase, and the well operators bound themselves to supply, the well operators' shares of the gas drawn from the common pool. Transco also agreed to a "take-or-pay" clause in each contract, thereby promising to pay the well operators for their shares of the potential gas streams whether or not it took immediate delivery of the gas.

Until May 1982, Transco also purchased the production shares of all of the nonoperating owners. It did so by spot market purchases at prices roughly equal to those it was paying to the contract owners rather than pursuant to fixed-price long-term supply contracts. But Transco announced in May 1982 that, because of a glut in the natural gas market, it would no longer purchase gas on the spot market from the noncontract owners of the Getty and Tomlinson wells. Coastal, which had an ownership interest in gas from one of the Getty wells, thereupon attempted to sell its share of the gas on the spot market to another pipeline company. Failing in this attempt, it then offered to sign a long-term supply contract with Transco on terms identical to those in Transco's contract with Getty. Transco refused Coastal's offer, and made a counteroffer to Coastal which was in turn refused.

Coastal and various noncontract owners then sought relief from the Mississippi Oil and Gas Board (Board), arguing that Transco's disproportionate purchasing of gas from the Harper Pool violated the Board's ratable-take rule (Rule 48), which provides:

> "Each person now or hereafter engaged in the business of purchasing oil or gas from owners, operators, or producers shall purchase without discrimination in favor

of one owner, operator, or producer against another in the same common source of supply." Statewide Rule 48 of the State Oil and Gas Board of Mississippi as set forth in App. to Juris. Statement 129a.

Transco opposed the relief sought by Coastal because enforcement of the rule would require Transco to purchase the same percentage of each owner's share of the pool's allowable production as it purchased from any other owner's share. Because of the "take-or-pay" obligations in its contracts with the operating owners, this would require it either to take more gas than it could profitably sell to its interstate customers or to pay the operating owners for the percentage of their shares that it did not presently take. Transco therefore urged the Board to reduce the allowable production from the common pool to reflect current market demand or to substitute a "ratable-production" rule for the existing "ratable-take" rule. Had the Board acceded to Transco's proposals, Transco's liability for its realized downside contractual risk resulting from the take-or-pay clauses would have been limited or avoided at the expense of the operating owners with whom it contracted. The Board instead ruled in favor of Coastal and against Transco, finding, *inter alia:*

> "Transco's course of conduct has been to discriminate against the owners (like Coastal) of relatively small undivided working interests in the . . . [w]ells and the common pool produced by the wells simply because they are owners of relatively small undivided interests.
>
> .     .     .     .     .
>
> "The Board finds that Transco's refusal to ratably take and purchase without discrimination Coastal's share of gas produced from the said common pool from which Transco is purchasing the operators' gas produced from the common pool by [the] very same wells and other wells completed into the common pool (1) is discriminatory in favor of the operators against Coastal and thereby violates Rule 48 . . . ; (2) constitutes 'waste' . . .

because, among other things, it abuses the correlative rights of Coastal in the common pool, results in non-uniform, disproportionate and unratable withdrawals of gas from the common pool causing undue drainage between tracts of land, and will have the effect and result of some owners in the pool producing more than their just and equitable share of gas from the common pool to the detriment of Coastal . . . ." App. to Juris. Statement 110a–111a.

The Board's order was affirmed by the Circuit Court of Hinds County, Mississippi, and affirmed by the Supreme Court of Mississippi insofar as it required ratable taking, despite Transco's claims of federal pre-emption and violation of the Commerce Clause. 457 So. 2d 1298 (1984).

The Court now reverses on pre-emption grounds. It holds that the ratable-take rule as applied to high-cost gas is pre-empted under the reasoning of *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S. 84 (1963), even though the NGPA removed the wellhead sales of such gas from the coverage of the NGA. I believe that the NGPA's removal of such gas from the NGA takes this case outside the purview of *Northern Natural*, and that a ratable-take rule such as that imposed by Mississippi is consistent with the NGPA's purpose of decontrolling the wellhead price of high-cost gas.

Congress passed the NGA in 1938 in response to this Court's holding that the Commerce Clause prevented States from directly regulating the wholesale prices of natural gas sold in interstate commerce. See *Missouri* v. *Kansas Natural Gas Co.*, 265 U. S. 298 (1924). The purpose of the NGA was "to occupy the field of wholesale sales of natural gas in interstate commerce." *Exxon Corp.* v. *Eagerton*, 462 U. S. 176, 184 (1983). Section 1(b) of the NGA, 52 Stat. 821, 15 U. S. C. § 717(b), defined the NGA's scope:

"The provisions of this Act shall apply to the *transportation* of natural gas in interstate commerce, to the *sale* in

interstate commerce of natural gas for resale for ulti-
mate public consumption for domestic, commercial, in-
dustrial, or any other use, and to natural gas companies
engaged in such transportation or sale, *but shall not
apply* to any other transportation or sale of natural gas
or to the local distribution of natural gas or to the facili-
ties used for such distribution or to the *production* and
*gathering* of natural gas." (Emphasis added.)

Initially, the Federal Power Commission (predecessor to the
Federal Energy Regulatory Commission (FERC)) inter-
preted § 1(b) to extend the NGA's coverage to gas sales at the
downstream end of interstate pipelines, but not to sales by
local producers to interstate pipelines. See, *e. g., Phillips
Petroleum Co.*, 10 F. P. C. 246 (1951); *Natural Gas Pipeline
Co.*, 2 F. P. C. 218 (1940). In 1954, however, this Court
gave § 1(b) a broader reading. See *Phillips Petroleum Co.*
v. *Wisconsin*, 347 U. S. 672 (1954). It interpreted the NGA
as creating exclusive federal jurisdiction over the regulation
of natural gas in interstate commerce, and § 1(b) as extend-
ing the NGA's coverage to both downstream and local sales,
though not to the production and gathering of natural gas.
*Id.*, at 677–678; see also *id.*, at 685–686 (Frankfurter, J.,
concurring).

*Northern Natural Gas Co.* v. *State Corporation Comm'n
of Kansas, supra,* was decided against this backdrop. In
*Northern Natural,* the Court held that a state ratable-take
rule as applied to the purchases of natural gas by interstate
pipelines was pre-empted by the NGA because it constituted
an "inva[sion into] the exclusive jurisdiction which the Natu-
ral Gas Act has conferred upon the Federal Power Commis-
sion over the sale and transportation of natural gas in inter-
state commerce for resale." *Id.*, at 89. The Court rejected
the argument that ratable-take rules "constitute only state
regulation of the 'production or gathering' of natural gas,
which is exempted from the federal regulatory domain by the
terms of § 1(b) of the Natural Gas Act." *Id.*, at 89–90. It

explained that because such rules apply to purchasers, they involve the regulation of wellhead sales. *Id.*, at 90. It also rejected the argument that they do not "threate[n] any actual invasion of the regulatory domain of the Federal Power Commission since [they] 'in no way involv[e] the *price* of gas.'" *Ibid.* (emphasis added). The Court reasoned that the NGA "leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, . . . or for state regulations which would indirectly" regulate price. *Id.*, at 91. Because ratable-take rules apply to purchasers, they indirectly regulate price and therefore "invalidly invade the federal agency's exclusive domain" of sales regulation.[3] *Id.*, at 92. Finally, the Court explained that although "States do possess power to allocate and conserve scarce natural resources upon and beneath their lands," *id.*, at 93, they may not use means such as ratable-take rules that "threaten effectuation of the federal regulatory scheme." *Ibid.*

The NGPA was passed in 1978 in response to chronic interstate gas shortages caused by price ceilings imposed pursuant to the NGA. Its purpose was to decontrol the wellhead price of natural gas sold to interstate pipelines, allowing prices to rise according to market conditions and causing shortages to vanish. To accomplish this purpose, it divided

---

[3] In *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984), this Court explained that "state law can be pre-empted in either of two general ways." *Id.*, at 248.

"If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. . . . If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, . . . or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Ibid.*

The reasoning of *Northern Natural* is that a state ratable-take rule is pre-empted if it invades the jurisdictional coverage of a statute that falls within the first category of the *Kerr-McGee* pre-emption test—statutes designed to "occupy a given field" to the exclusion of state regulation.

the supply of gas into three major categories: high-cost gas, new gas, and old gas. See Pierce, Natural Gas Regulation, Deregulation, and Contracts, 68 Va. L. Rev. 63, 87–89 (1982). It removed the wellhead sales of high-cost and new gas from the coverage of the NGA. NGPA § 601(a)(1)(B), 15 U. S. C. § 3431(a)(1)(B). It then established formulas for the gradual decontrol of the wellhead prices of such gas. See NGPA §§ 102(b), 103(b), 107(a), 15 U. S. C. §§ 3312(b), 3313(b), 3317(a). The wellhead price of high-cost gas was totally decontrolled in November 1979. See NGPA § 121(b), 15 U. S. C. § 3331(b); Pierce, *supra*, at 87–88. Ceilings continue to apply to the wellhead prices of old gas. See *id.*, at 88–89. Because gas from the Harper Sand Gas Pool qualifies as high-cost gas, the NGA no longer covers its wellhead price. Moreover, to the extent the NGPA ever controlled the wellhead prices of such gas, cf. *Public Service Comm'n of New York* v. *Mid-Louisiana Gas Co.*, 463 U. S. 319 (1983), those controls have long since been eliminated.[4] Therefore, *Northern Natural* does not govern this case. Rather, the issue is whether Mississippi's ratable-take rule stands as an obstacle to the full accomplishment of the NGPA's purpose. See *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984).

The purpose of the NGPA with respect to high-cost gas is to eliminate governmental controls on the wellhead price

---

[4] FERC's remaining jurisdiction to prevent interstate pipelines from fraudulently, abusively, or otherwise illegitimately passing on higher wellhead prices to ultimate consumers, see 15 U. S. C. § 3431(c)(2), does not include jurisdiction over wellhead price levels. Cf. *Exxon Corp.* v. *Eagerton*, 462 U. S. 176, 184 (1983) (state statute directly prohibiting interstate pipelines from passing on severance tax to consumers invades FERC's pass-on jurisdiction); *Maryland* v. *Louisiana*, 451 U. S. 725, 746–752 (1981) (state statute indirectly requiring interstate pipelines to pass on severance tax to consumers invades FERC's pass-on jurisdiction); *id.*, at 747, n. 22 (question whether tax conflicted with FERC's authority to control price of gas expressly reserved).

of such gas.[5]  State regulation that interferes with this purpose is pre-empted.  See *Arkansas Electric Cooperative Corp.* v. *Arkansas Public Service Comm'n,* 461 U. S. 375, 384 (1983).  State regulation that merely defines property rights or establishes contractual rules, however, does not interfere with this purpose.  Markets depend upon such rules to function efficiently.

Ratable-take rules serve the twin interests of conservation and fair dealing by removing the incentive for "drainage." On its face, the ratable-take rule here is completely consistent with the free market determination of the wellhead price of high-cost gas.  Like any compulsory unitization rule, it gives joint owners the incentive to price at the same level as a single owner.  But it will not affect the spot market price of gas in any other way.  It is similarly price neutral in the context of long-term contracting.  The rule is merely one of a number of legal rules that regulates the contractual relations of parties in the State of Mississippi as in other States.  The

---

[5] The majority also mentions "supply" and "demand" as economic variables that Congress intended to decontrol.  There is no support for this in the legislative history, and the use of these variables unnecessarily complicates and distorts the pre-emption analysis.  The NGPA was concerned with supply only to the extent that price ceilings create shortages.  The Court has always acknowledged that conservation of the supply of natural gas is traditionally a function of state power.  See, *e. g., Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas,* 372 U. S. 84, 93 (1963).  Thus, it has upheld the common state practice of placing ceilings, called "allowables," on the amount of gas that a particular well or pool may produce during a given period.  See, *e. g., Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma,* 286 U. S. 210 (1932).  Such absolute restrictions on output have the potential of raising wellhead prices above competitive equilibrium.  Ratable-take rules, by themselves, do not.

There is even less reason to infer a purpose to decontrol demand.  To the extent central planners even have the power to control demand, their control is limited to the manipulation of output and price.  Planners have no obvious control over individual preferences.  It therefore makes little sense to consider "demand" to be an independent object of the NGPA's decontrol purpose.

Court, however, seems to equate Mississippi's rule requiring equitable dealing on the part of pipeline companies purchasing from common owners of gas pools as akin to a tax or a subsidy, both of which do tend to distort free market prices.

Unlike taxes or subsidies, however, rules regulating the conditions of contracts have only an attenuated effect on the operation of the free market. Their effect is often to promote the efficient operation of the market rather than to inhibit or distort it the way a tax or subsidy might. A ratable-take rule applied to a common pool eliminates the inefficiencies associated with the perverse incentives of common ownership of a gas pool. It is different from a rule that would require any out-of-state pipeline that purchases gas from one in-state pool of gas to purchase equal amounts from every other in-state pool. This latter type of rule might well burden interstate commerce or violate the free market purpose of the NGPA. But a ratable-take rule applied to a common pool promotes, rather than inhibits, the efficiency of a competitive market. Moreover, States have historically included ratable-take rules in developing the body of law applicable to natural gas extraction. See, e. g., *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U. S. 210, 233 (1932); *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 340 U. S. 179 (1950). One may agree that Congress wished to return to the free market determination of the price of high-cost gas without concluding that Mississippi's ratable-take rule frustrates that wish.

Rule 48 was promulgated by the Mississippi Board long before the enactment of the NGPA, and the fact that it had not previously been applied to this type of transaction affords no argument against its validity based on federal pre-emption. Indeed, the implication in the Court's opinion that a midstream expansion in the coverage of a state regulation justifies pre-emption if the party to whom the rule is applied claims disappointed expectations is nothing less than Contract Clause jurisprudence masquerading as pre-emption. A

party runs the risk of reasonably foreseeable applications of new principles of state law to its activities, see *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400 (1983), and that is the most that can be said to have happened here. The only reason the ratable-take rule has any adverse effect on Transco is that Transco entered supply contracts with the well operators that included "take-or-pay" obligations. The NGPA gives Transco no basis for insisting that state law be frozen as of the moment it entered the "take-or-pay" agreements, protecting it from the imposition of any additional correlative obligations to noncontracting owners.[6]

Because of my conclusion that Mississippi's ratable-take rule is not pre-empted, I also address appellant's contention that the rule violates the "dormant" Commerce Clause. The analysis is much the same as under the NGPA. Indeed, the implicit "free market" purpose of that Clause would seem to add little to the express congressional purpose to decontrol prices, which is the focus of the pre-emption analysis. Here the statute regulates evenhandedly to effectuate a legitimate local public interest—the interest in both fair dealing on the part of joint owners and conservation—and its effects on interstate commerce are incidental at most. The question of burden, therefore, is "one of degree," *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970).

In *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.*, *supra*, this Court held that ratable-take rules do not violate the dormant Commerce Clause because they do not place a significant burden on the out-of-state interests in a free market.

---

[6] Nor does the ratable-take rule conflict with the NGPA's alleged uniformity or consumer protection purposes. While the congressional desire to *de*control prices uniformly throughout the Nation includes an intent to prevent States from enacting regulation to *re*control them, it does not imply an intent either to create an anarchistic regulatory gap free from property rights and contract rules, or to create a national law of contracts to govern natural gas relationships.

That analysis should control this case. Transco's interest in a free market is not significantly burdened because the ratable-take rule creates no discriminatory burden independent of Transco's supply contracts. The validity of a state rule should not depend on whether, in combination with private contracts, it contributes to a short-run burden. Similarly, enforcement of the ratable-take rule in combination with the take-or-pay obligations does not significantly burden the free-market interest of out-of-state natural gas consumers because the combination will have virtually no effect on consumer prices. High-cost gas makes up only a tiny fraction of the aggregate supply of natural gas. See Pierce, 68 Va. L. Rev., at 88, n. 98 (about 1%). Thus, any increased costs associated with it will tend to be a mere drop in the bucket. Moreover, the rule leaves pipelines free to minimize their losses by simply paying the contract owners their contractual due, and to pay no more than the current spot market price for any noncontract gas it takes. Therefore, enforcement of the rule is unlikely to affect the downstream price that consumers will pay in any significant way.

Nor was it unreasonable for Mississippi to enforce its ratable-take rule when a "ratable-production" rule might have been a less restrictive means of serving the State's legitimate conservation interest. The burden on interstate commerce imposed by the "ratable-take" rule is so minimal and attenuated that there is no occasion to inquire into the existence of a "less restrictive" means. Moreover, a "ratable-production" rule, as even appellant Transco agrees, would place greater administrative and enforcement burdens on the Mississippi regulatory authorities:

> "[A]n order directed to the purchaser of the gas rather than to the producer would seem to be the most feasible method of providing for ratable taking, because it is the purchaser alone who has a first-hand knowledge as to whether his takes from each of his connections in the field are such that production of the wells is ratable. An

order addressed simply to producers requiring each one to produce ratably with others with whose activities it is unfamiliar and over whose activities it has no control would create obvious administrative problems." *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S., at 100–101 (Harlan, J., dissenting) (footnotes omitted).

I believe that Mississippi's ratable-take rule as applied to high-cost gas offends neither FERC's jurisdiction, the applicable provisions of the NGPA, or the Commerce Clause. I would therefore affirm the judgment of the Supreme Court of Mississippi.