No. 56,917[1]

NORTHWEST CENTRAL PIPELINE CORPORATION; COLORADO INTERSTATE GAS COMPANY; AMOCO PRODUCTION COMPANY; and K N ENERGY, INC.; *Appellants,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS; MICHAEL LENNEN, Chairman; RICHARD C. (PETE) LOUX, Commissioner; PHILLIP R. DICK, Commissioner; and their respective successors in office; *Appellees.*

(732 P.2d 775)

Opinion on remand filed February 20, 1987. (For original opinion affirming see 237 Kan. 248, 699 P.2d 1002 [1985], vacated and remanded 475 U.S. 1002, 89 L. Ed. 2d 289, 106 S. Ct. 1169 [1986]).

*Mark H. Adams, II,* of Adams & McCarthy, of Wichita, argued the cause, and *Kent L. Jones* and *Orval E. Jones,* of Hall, Estill, Hardwick, Gable, Collingsworth

---

[1] REPORTER'S NOTE: This case was argued by the parties and decided in conference by the Supreme Court prior to the retirement of Chief Justice Schroeder and the appointment of Justice Allegrucci.

& Nelson, Inc., of Tulsa, Oklahoma, were with him on the briefs for appellant Northwest Central Pipeline Corporation.

*Ralph R. Brock,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause and was on the brief for appellants Cabot Petroleum Corporation, Northern Pump Company, Graham-Michaelis Corporation, and Kansas Petroleum, Incorporated.

*Timothy E. McKee,* of Triplett, Woolf & Garretson, of Wichita, argued the cause, and *Eugenia K. Helm* and *Eric Brown,* of Colorado Springs, Colorado, were with him on the briefs for appellant Colorado Interstate Gas Company.

*Lee Thompson,* of Martin, Pringle, Oliver, Wallace & Swartz, of Wichita, argued the cause and was on the brief for appellant K N Energy, Incorporated.

*Brian J. Moline,* general counsel, argued the cause and *James E. Browne,* assistant general counsel, was with him on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This case was originally before the Court in *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n,* 237 Kan. 248, 699 P.2d 1002 (1985). There, we upheld the district court's order affirming a Kansas Corporation Commission (KCC or Commission) order which amended paragraph (p) of the basic proration order for the Kansas Hugoton Gas Field. The appellants sought review of our decision in the United States Supreme Court, which remanded the case to this Court with directions to reconsider our decision in light of a recent Supreme Court decision, *Transcontinental Pipe Line v. Oil & Gas Bd.,* 474 U.S. 409, 88 L. Ed. 2d 732, 106 S. Ct. 709 (1986) *(Transco).*

The facts were set out in some detail in our previous decision and need not be fully repeated here. However, we briefly summarize them for convenient reference.

K.S.A. 55-701 *et seq.* provides the KCC with authority to regulate the taking of natural gas from common sources of supply within the state in order to prevent the inequities or unfair taking of natural gas from a common source of supply. Acting pursuant to this authority, on March 21, 1944, the Commission adopted the basic proration order for the Hugoton Field. The order provides limits or "allowables" for production for each well in the field. The allowables are assigned pursuant to a deliverability formula which balances various factors in an effort to regulate production to make the amount produced over time from any well equal to the amount of gas originally underlying the developed lease.

If a well produces less than its allowable, it accrues an "underage," the difference between its allowable and actual production. When a well is underproduced in relation to its allowable, its pressure rises and gas "drains" to the lower pressure areas of overproduced wells. When the larger allowable and underage is later produced, the well's pressure drops and compensating drainage occurs. After the pressure drops, the adjusted deliverability is decreased, keeping the wells in balance in the "long pull." 237 Kan. at 250-51.

Prior to 1983, cancelled underage could accumulate indefinitely and producers could postpone taking gas from wells indefinitely without an adverse regulatory effect. Because of these conditions, purchasers were using the Kansas portion of the Hugoton Field for "storage" and purchasing additional reserves elsewhere for immediate use. This forced the Kansas Hugoton Field production below good recovery practices and upset the dynamics of the Hugoton Field, affecting both proration and correlative rights.

Accordingly, in February of 1983, the KCC amended the basic proration order to provide that underages would be permanently cancelled if the producer did not reinstate them within a certain period of time or, if reinstated, the underage was not produced within five years.

Although numerous issues were raised in the initial appeal, the primary issue for our reconsideration upon remand is whether the Commission's order improperly interferes with federal regulation of natural gas in interstate commerce. We originally resolved this issue by holding that federal regulation does not apply to the production or gathering of natural gas, citing *Northern Gas Co. v. Kansas Comm'n.*, 372 U.S. 84, 9 L. Ed. 2d 601, 83 S. Ct. 646 (1963) (*Northern Gas*). We reasoned that rules on underages are part of production regulation and thus do not violate federal regulations. 237 Kan. at 267.

Before considering whether the United States Supreme Court's decision in *Transco* requires us to change our original conclusions, let us examine the facts and holdings in both the *Northern Gas* and *Transco* cases.

### Northern Gas

In *Northern Gas,* the United States Supreme Court set aside

an order of the Kansas Corporation Commission requiring interstate gas pipelines purchasing gas from the Hugoton Field to take gas ratably from the wells to which they were connected.

The principal argument made by the Commission in *Northern Gas* was that the ratable take order, essential for the conservation of natural gas and conservation, is traditionally a function of state government.

The Supreme Court recognized that a significant distinction exists between conservation measures aimed directly at interstate purchasers and wholesales for resale, and those aimed at producers and production. The Court held that measures aimed at *purchasers* cannot be sustained when they threaten "the achievement of the comprehensive scheme of federal regulation." 372 U.S. at 94.

The "comprehensive scheme of federal regulation" referred to by the Court was the Natural Gas Act (NGA), 15 U.S.C. § 717 *et seq.* (1982). In discussing this act, the Court held:

"The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas (citation omitted) or for state regulations which would *indirectly achieve* the same result." 372 U.S. at 91 (Emphasis added.).

The Court then concluded that the ratable take orders at issue in this case

"necessarily deal with matters which directly affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act." 372 U.S. at 91-92.

### Transco

Fifteen years after the Supreme Court decided *Northern Gas,* Congress enacted the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3301 *et seq.* (1982), which vested regulatory power in the states over the wellhead sale of gas. One question before the Supreme Court in *Transcontinental Pipe Line v. Oil & Gas Bd.,* 474 U.S. 409, was whether the NGPA effectively overruled *Northern Gas.*

The Mississippi regulation at issue in *Transco* required gas purchasers to purchase gas ratably without discrimination in favor of one producer against another in the same source of supply. Transco, an interstate pipeline company, appealed the

State Oil and Gas Board (Board) ruling enforcing the regulation. The Circuit Court of Mississippi and the Mississippi Supreme Court affirmed, holding that the NGPA removed from the Federal Energy Regulatory Commission (FERC) the authority conferred on it by the NGA to regulate the sale and transportation in interstate commerce of "high cost" gas. The Mississippi court thus held that the NGPA effectively overruled *Northern Gas.*

On appeal, the United States Supreme Court reversed and held the Board's order was preempted by the NGA and the NGPA.

In so holding, the Court first reviewed *Northern Gas* and noted the Court's finding of preemption in that case rested upon two considerations:

"First, Congress had created a comprehensive regulatory scheme, and ratable-take orders fell within the limits of that scheme rather than within the category of regulatory questions reserved for the States. Second, in the absence of ratable-take requirements, purchasers would choose a different, and presumably less costly, purchasing pattern. By requiring pipelines to follow the more costly pattern, Kansas' order conflicted with the federal interest in protecting consumers by ensuring low prices." 88 L. Ed. 2d at 743.

Thus, under this two-part test, the Court first had to determine whether the Mississippi Board's actions fell within a "comprehensive regulatory scheme." This determination required an examination of the NGPA. The Court considered the history of the NGPA and held its enactment reflected a congressional belief that a new system of natural gas pricing was needed to balance supply and demand. However, the Court concluded the NGPA did not "constitute a federal retreat from a comprehensive gas policy." 88 L. Ed. 2d at 743. The Court reached this conclusion despite the fact that the NGPA specifically states that the provisions of the NGA and the jurisdiction of the FERC shall not apply to the "first sale" of high cost gas or new natural gas.

The Court reasoned that the fact the FERC can no longer directly regulate the prices at which pipelines purchase high cost gas has little to do with whether state regulations which affect a pipeline's cost and purchasing patterns impermissibly intrude upon federal concerns. The Court further reasoned that the inability of the FERC under the NGPA to regulate some aspects of wellhead sales of gas is a result of Congress' intent that

the determination of supply and first-sale price be left to the market. Finally, the Court concluded that while Congress enacted the NGPA in an attempt to move toward a less regulated national natural gas market, its decision to remove jurisdiction from the FERC cannot be interpreted as an invitation to the states to impose additional regulations. 88 L. Ed. 2d at 744.

The Court next determined the Mississippi Board's order disturbed the "uniformity of the federal scheme," 88 L. Ed. 2d at 745, because it would have the effect of increasing the ultimate price of gas to consumers. The Court reasoned that since "take-or-pay" provisions are standard industry-wide and pipelines are already committed to purchase gas in excess of market demand, Mississippi's order would require Transco to take delivery of non-contract gas. This in turn would result in Transco not taking delivery of contract gas elsewhere, triggering take-or-pay provisions and ultimately increasing costs to Transco customers. 88 L. Ed. 2d at 745.

The Commission now urges this court to apply the same analysis used in *Transco,* but to reach a different result than did the Supreme Court—*i.e.,* that the order amending the basic proration order for the Hugoton Field is not preempted by the NGA or the NGPA. In contrast, the appellants argue that *Transco* requires us to reverse our previous ruling upholding the Commission's order.

In determining whether *Transco* necessitates a reversal of our previous holding, we should apply the two-part test employed by the Supreme Court in both *Northern Gas* and *Transco.* First, we must consider whether the order amending the basic proration order for the Hugoton Field falls within the limits of a comprehensive federal regulatory scheme rather than within the category of regulatory questions reserved for the states; and, if so, whether the effect of the order will be to impair market forces.

The Commission argues the order in question here does not come within a comprehensive federal regulatory scheme because it is directed at producers of natural gas rather than purchasers. The Commission points out that Congress has specifically excluded the areas of "production and gathering" from the FERC's jurisdiction under the Natural Gas Act. 15 U.S.C.

§ 717(b). "Production" and "gathering" are terms which have been narrowly defined to include the physical acts of drawing gas from the earth and preparing it for the first stages of distribution. *Northern Gas Co. v. Kansas Comm'n.*, 372 U.S. at 90. This distinction was also recognized in *Transco* where the Court noted that it is " 'undeniable that a state may adopt reasonable regulations to prevent economic and physical waste of natural gas.' " 88 L. Ed. 2d at 742 (quoting *Cities Service Co. v. Peerless Co.*, 340 U.S. 179, 95 L. Ed. 190, 71 S. Ct. 215 [1950]).

The Commission further argues that the issue of federal preemption was adequately dealt with in our first opinion on this case where we determined that the Commission's order was not preempted by federal regulation. We held:

"The order in the instant case gives us pause. It obviously is intended for purchasers, but is directed to producers. Hence, the question which this court must decide is whether this indirect effort to influence purchasers meets the standards noted in *Northern Gas,* which would preclude state regulation in this area. As stated in *Northern Gas,* federal regulation does not apply to the production or gathering of natural gas. Interpreted in a narrow sense, as suggested by *Northern Gas,* the matter of allowables must be construed to pertain to production. The state has regulatory authority over production. The rules on underages are a part of production regulation and thus are not violative of the federal act, even though purchasers are indirectly caught in the backwash." 237 Kan. at 266-67.

The appellants concede that the NGA does not confer jurisdiction to the FERC over the production or gathering of natural gas, but argue the Commission's order, both in *purpose* and *effect,* is not so limited. As support for this argument, the appellants point out that the admitted purpose of the order is to compel interstate pipelines to purchase a greater volume of gas from the Hugoton Field. The Commission argues its purpose was to prevent waste and protect correlative rights.

The appellants also refer to the Supreme Court's statement in *Transco* that "[the Mississippi order] disturbs the uniformity of the federal scheme, since interstate pipelines will be forced to comply with varied state regulations of their purchasing practices." 88 L. Ed. 2d at 745. Appellants contend that if another state were to promulgate a similar order to "encourage production," the appellants would be forced to comply with numerous state regulations regarding purchasing practices, thus "disturbing the uniformity of the federal scheme."

The Commission does not dispute that its order will have an impact upon *"all facets* of the market including interstate commerce." However, it contends any such effect will be the result of decisions by the pipeline purchasers, not the gas producers to whom the order is addressed.

We have reexamined our decision in light of *Transco,* as suggested by the U.S. Supreme Court. From that reexamination, we conclude this case is distinguishable from *Transco.* There, the state regulation is addressed to gas purchasers. Here, the amendment to paragraph (p) of the basic proration order for the Kansas Hugoton Gas Field pertains to gas producers. Congress specifically excluded production and gathering of gas from the FERC's jurisdiction under the Natural Gas Act. 15 U.S.C. §717(b). Further, the Commission is vested with the responsibility to prevent waste and protect correlative rights of producers and landowners when production is from a common source of supply. *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n,* 237 Kan. at 254; *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, Syl. ¶ 5, 222 P.2d 704 (1950). The Commission has exercised its authority in this case by limiting the time in which producers may reinstate underages. Placing such a limitation on recovery of underages is a part of the Commission's authority to prorate and control production to prevent economic and physical waste and to protect correlative rights between producers in the Kansas Hugoton Gas Field and those in the Oklahoma and Texas Hugoton Field.

It is obviously correct that any change in rates of production of gas sold in interstate commerce has an effect on the interstate market. But that alone does not eliminate the jurisdiction of the Kansas Corporation Commission. If so, the FERC would have total jurisdiction over all gathering and production of gas which is sold in interstate commerce.

We think the test of whether the FERC has jurisdiction over state regulation of producers is whether the regulation is primarily directed at the marketing of gas rather than production thereof. Here, the Commission found the amendment to paragraph (p) of the basic proration order was necessary for the prevention of waste and protection of correlative rights. Though

controverted, there is evidence in the record to support that finding. Further, any effect on interstate sales of gas is merely incidental rather than the objective of the order. Thus, we hold the order does not transgress federal regulation of natural gas in interstate commerce.

The order is affirmed.

SCHROEDER, C.J., dissenting.

ALLEGRUCCI, J., not participating.