83 F.3d 1219
 133 Oil & Gas Rep. 353, Util. L. Rep. P 14,108
 PANHANDLE EASTERN PIPELINE COMPANY; Northwest Central
Pipeline Corporation; ANR Pipeline Company; Natural Gas
Pipeline Company of America; Mississippi River Transmission
Corporation; KN Energy, Inc.; Public Service Company of
Oklahoma; Tennessee Gas Pipeline Company, a division of
Tenneco, Inc., Plaintiffs-Appellees,
Colorado Interstate Gas Company; Amoco Production Company;
Anadarko Production Company; Apache Corporation; CNG
Producing Company, Cities Service Oil & Gas Corporation;
Cotton Petroleum Corporation; Mobil Oil Corporation;
Mustang Production Company; Phillips Petroleum Company;
Sohio Petroleum Company; Sun Exploration and Production;
Tenneco Oil Company; Texaco, Inc.; Union Oil Company of
California; Warren Petroleum Company, a division of Chevron
U.S.A., Inc.; Atlantic Richfield Company,
Plaintiffs-Intervenors-Appellees,
El Paso Natural Gas Company and Arkla, Inc. (now known as
Noram Energy Corporation), Plaintiffs,
v.
STATE OF OKLAHOMA, ex rel., COMMISSIONERS OF the LAND
OFFICE; Clifton H. Scott, John M. Folks, Jack D.
Craig, Henry Bellmon, Robert S. Kerr,
III, Commissioners of the Land
Office, Defendants,
Oklahoma Mineral Owners Association; Jess Stratton, Jr.,
Defendants-Intervenors-Appellants.
 No. 94-6325.
 United States Court of Appeals,
Tenth Circuit.
 May 6, 1996.
 
 Allan DeVore of The DeVore Law Firm, Oklahoma City, Oklahoma (Marjorie Ramana, The DeVore Law Firm and Douglas E. Burns, with him on the brief), for Defendants-Intervenors-Appellants.
 Donna Nix Blakley of Hill, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, Oklahoma (Sharon Taylor Thomas of Hill, Estill, Hardwick, Gable, Golden & Nelson; Teresa B. Adwan and M. Benjamin Singletary of Gable & Gotwals, Tulsa, Oklahoma; Karen L. Pauley and Michael L. Williams of the Colorado Interstate Gas Company, with her on the brief), for Plaintiffs/Appellees.
 Clyde A. Muchmore of Crowe & Dunlevy, Oklahoma City, Oklahoma (Mark D. Christiansen and Harvey D. Ellis, Jr., with him on the brief), for Plaintiffs-Intervenors-Appellees.
 Before ANDERSON, McKAY and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This appeal concerns the constitutionality of an Oklahoma law, Senate Bill 160 ("SB 160"), that amended Oklahoma statutory obligations owed by purchasers and producers of oil and natural gas to owners of royalty interests. SB 160 became effective in 1985 and remained so until July 1, 1993, when it was effectively repealed and replaced by legislation that is not challenged by these parties. The district court, exercising jurisdiction under 28 U.S.C. § 1331, ruled, on summary judgment, that SB 160 violated the Supremacy Clause, the Contracts Clause, and the Fourteenth Amendment.[1] The district court also held that the Oklahoma legislature intended SB 160 to apply prospectively only. The Oklahoma Mineral Owners' Association ("OMOA") and Jess Stratton, Jr., a mineral owner (collectively, "Mineral Owners"), appeal. They also ask this court to certify certain questions to the Oklahoma Supreme Court, and contend that issues of material fact precluded summary judgment below. We DENY the motion for certification, and conclude that SB 160 is preempted by federal law insofar as it burdens interstate purchasers of natural gas. We further conclude that the invalid provisions of SB 160 are not severable from the remainder of the statute, and thus we conclude that SB 160 is unconstitutional in its entirety. Consequently, we AFFIRM the judgment of the district court.
 
 Background
 
 2
 The Appellee pipeline companies ("Purchasers") are natural gas companies and interstate pipelines, as defined by the Natural Gas Act, 15 U.S.C. § 717a(6) and the Natural Gas Policy Act, 15 U.S.C. § 3301(15).[2] During the times relevant to this appeal, Purchasers have purchased, sold and transported gas in interstate commerce. They each purchase natural gas from producers under gas purchase contracts covering wells throughout Oklahoma, most of which are located on "drilling and spacing units" created by orders of the Oklahoma Corporation Commission. The Appellee-Intervenor producers ("Producers") own interests in oil and gas leases within these drilling and spacing units. Producers primarily produce and market oil and gas, but occasionally they purchase gas from other producers, thus assuming the role of first purchasers.
 
 
 3
 Until 1985, Oklahoma statutory law imposed the following obligation on oil and gas producers:
 
 
 4
 In the event a producing well or wells are completed upon a unit where there are ... two or more separately owned tracts, any royalty owner holding the royalty interest [in a tract in the unit] shall share in the one-eighth (1/8) of all production from the well or wells drilled within the unit ... in the proportion that the acreage of their separately owned tract or interest bears to the entire acreage of the unit; provided, where a lease covering any such separately owned tract or interest included within a spacing unit stipulates a royalty in excess of one-eighth (1/8) of the production ... then the lessee of said lease out of his share of the working interests ... shall sustain and pay said excess royalty....
 
 
 5
 Okla. Stat. tit. 52, § 87.1(e) (Supp.1984). In 1963, the Oklahoma Supreme Court interpreted this provision to mean that a royalty owner whose own lessee is not selling gas is nonetheless entitled to a proportionate share of the statutory one-eighth royalty from all production in the unit. Accordingly, the court held that when a well is producing from a drilling and spacing unit established under the Oklahoma Corporation Commission, each producer-lessee selling production from a well must account to all royalty owners in the unit (as opposed to only its own lessor) for the owners' proportionate shares of the statutory one-eighth royalty share of production proceeds. Shell Oil Co. v. Corporation Comm'n, 389 P.2d 951 (Okla.1963) (the "Blanchard " case). According to Producers, standard industry practice before the Blanchard decision was to include in leases a minimum 1/8 royalty interest payment. See Richard W. Hemingway, The Law of Oil and Gas § 7.1, at 381 (3d ed. 1991) ("The then-customary provisions [in the earliest leases] were that the lessor was entitled to a fractional portion, usually 1/8, of the oil ....") (footnote omitted). Thus, the Blanchard decision did not alter the burden on producer-lessees; they still paid 1/8 of their proceeds to royalty owners. Any amount in excess of 1/8 was paid only by an individual lessee, out of its own working interest, to its own lessor pursuant to specific lease provisions.
 
 
 6
 The duties of oil and gas purchasers were not at issue in the Blanchard case. These Purchasers, pursuant to most of their oil and gas contracts, were obligated to pay the full sales price to producers, who in turn were independently responsible for royalty payments and any other obligations due under the oil and gas leases between lessee-producers and lessor-owners.[3]
 
 
 7
 During the early 1980s there was an oversupply of natural gas. As a result, royalty owners experienced difficulty in obtaining their royalty payments. The Oklahoma Legislature responded by enacting Senate Bill 160 ("SB 160") in 1985, amending two existing statutes to provide greater rights to royalty owners. Okla. Stat. tit. 52, § 87.1(e) was amended to provide in relevant part:
 
 
 8
 In the event a producing well or wells are completed upon a unit where there are ... two or more separately owned tracts, the first purchaser or purchasers shall be liable to any royalty owner ... holding the royalty interest under a separately owned tract included in such drilling and spacing unit for the payment of proceeds from the sale of production from the drilling and spacing unit. Each royalty interest owner shall share in all production from the well or wells drilled within the unit ... to the extent of such royalty interest owner's interest in the unit. Each royalty interest owner's interest in the unit shall be defined as the percentage of royalty, including the normal one-eighth (1/8) royalty, overriding royalties or other excess royalties owned in each separate tract by the royalty owner, multiplied by the proportion that the acreage [owned] bears to the entire acreage of the unit. The first purchaser or purchasers shall also be jointly and severally liable for the payment to each royalty interest owner of any production payments or other obligations for the payment of monies contained within the leases covering any lands lying within the drilling and spacing unit. Nothing in this act shall relieve a lessee or his assignees from any obligations imposed by the lease.
 
 
 9
 (Supp.1985) (emphasized language added by SB 160).
 
 
 10
 Also challenged is SB 160's amendment of Okla. Stat. tit. 52, § 540. The challenged portion of that statute read:
 
 
 11
 B. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, calculated from date of first sale.
 
 
 12
 (Supp.1985) (emphasized language added by SB 160).
 
 
 13
 The legislation thus amended existing law in several significant ways. First, it amended the previous method under which a royalty owner's interest in a spacing or drilling unit was determined. Whereas the previous statute, as construed in the Blanchard case, provided that royalty owners in a unit would share in one-eighth of all production from the unit, the amended statute provides that each royalty owner shares in all production in the unit, to the extent of his " 'royalty owner's interest in the unit.' " Okla. Att'y Gen. Op. No. 88-76 (Jan. 13, 1989). The statute expressly defines "royalty owner's interest" to include both "the normal 1/8 royalty" and other royalties such as overriding royalties or other excess royalties negotiated by the royalty owner. Because there was a lack of information as to the royalties owed to the owners, this change substantially affected parties' rights and obligations when not all owners were selling proportionally from the well or wells draining their unit. Second, SB 160 clearly placed responsibility for royalty payments on the first purchaser and did not provide an opportunity for the purchasers to contract away that obligation.[4]
 
 
 14
 SB 160 became effective in October 1985. Immediately thereafter, Purchasers filed this suit in federal district court. The named defendants were the Commissioners of the Land Office of the State of Oklahoma ("CLO"), who hold title to certain state mineral and royalty interests. Producers intervened as plaintiffs, and Mineral Owners intervened as defendants. Purchasers challenged SB 160's imposition on them of direct liability to all royalty owners in a unit for: (1) all royalties at the royalty rate specified in each oil and gas lease in the unit, regardless of whether the pipeline has a contract with the royalty owner's lessee; (2) royalties due under leases for gas and oil purchased by other purchasers; and (3) other lessor-lessee lease contract money obligations not related to purchase of oil or gas production. Moreover, because SB 160 imposes on first purchasers the burden of ensuring that all royalty owners are paid, Purchasers alleged that they would incur substantial expense in administering a system for compliance. Purchasers also alleged that if SB 160 were applied to existing contracts, it could result in double liability to them because their existing contracts typically require them to pay all proceeds to producers, and yet SB 160 requires them to make royalty payments directly to royalty owners--thus leading to double payments. Producers challenged SB 160 because when the Blanchard ruling is applied to the new language, any lessee selling gas from the unit is obligated to account to all royalty owners not only for the 1/8 royalty but also for excess royalties negotiated under any royalty owners' lease; each producer/lessee therefore is required to bear a share of excess royalties created by other producer/lessees, even if greater than the royalty fraction agreed to under its own lease.
 
 
 15
 There appears to have been little compliance with SB 160 within the natural gas industry. Neither Producers nor Purchasers allege either compliance with SB 160 or any attempt by the state to enforce SB 160 against them. In April 1992, the Oklahoma Legislature enacted Senate Bill 168 ("SB 168"), the Production Revenue Standards Act, which repealed and replaced the contested SB 160 amendments and created new procedures for the payment of royalty obligations. Portions of SB 168 became effective in September 1992, while the remainder became effective July 1, 1993. The parties appear to agree that SB 168 is constitutional. Producers have no dispute with SB 168, as it allows producers disadvantaged by its royalty payment provisions to offset any loss by producing a correspondingly greater volume of gas than they would otherwise be entitled to produce. Purchasers agree that SB 168 remedied the constitutional defects of SB 160, because SB 168 explicitly provides that a purchaser who pays its contracted producer for gas taken is thereafter liable to no other parties. Thus, the determination whether SB 160 was constitutional affects the rights and liabilities of these parties for the period 1985 to 1993 only.[5]
 
 
 16
 Following a lengthy period during which the federal action was suspended in the ultimately futile hope that the Oklahoma Supreme Court would interpret SB 160, the federal district court reopened the case and invited the parties to submit a joint list of proposed questions to be certified to the Oklahoma Supreme Court. The parties could not sufficiently agree to a joint submission, and the court denied the motion for certification. At a status conference in June 1993, the court granted the parties permission to supplement the summary judgment briefs already filed, and Plaintiff Purchasers were permitted to amend their complaint to include a claim of preemption. In July 1994, the district court entered an order and judgment holding that SB 160 violated the Contracts Clause and the Fourteenth Amendment, and that SB 160 is preempted by federal law. Defendant Mineral Owners appeal; Defendant CLO does not appeal.
 
 I. Preemption
 
 17
 We turn first to the district court's determination that SB 160 is preempted by federal law. As this is a conclusion of law, our review is de novo. Estate of Holl v. Commissioner, 967 F.2d 1437, 1438 (10th Cir.1992). The preemption doctrine is rooted in the Supremacy Clause, which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2.
 
 
 18
 Determining whether Congress has exercised its power under this clause to preempt state law requires an examination of congressional intent. Northwest Cent. Pipeline v. Kansas Corp. Comm'n, 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989).
 
 
 19
 In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the states to supplement federal law, or where the state law at issue conflicts with federal law, either because it is impossible to comply with both or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives.
 
 
 20
 Id. (citations omitted).
 
 
 21
 The district court found that SB 160 is preempted by the Natural Gas Act ("NGA"), 15 U.S.C. § 717, et seq., as amended by the Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301, et seq.[6] The regulatory scheme established by these statutes carefully allocates the regulation of the natural gas industry between federal and state authorities. To determine whether SB 160 is preempted, therefore, we must closely examine the contours of that scheme.
 
 
 22
 The NGA was enacted in 1938, after a series of Commerce Clause cases striking down state laws "left the states powerless to regulate interstate transportation and wholesales" of natural gas. Cascade Natural Gas Corp. v. FERC, 955 F.2d 1412, 1416 (10th Cir.1992). The NGA was enacted to fill this void. "[W]ithout supplanting any of the existing authority of the state agencies, the Act was intended to provide a powerful regulatory partner, the Federal Power Commission [now the Federal Energy Regulatory Commission], which could regulate activities where the state bodies could not." Corporation Comm'n v. FPC, 415 U.S. 961, 962, 94 S.Ct. 1548, 1548, 39 L.Ed.2d 863 (1974) (Rehnquist, J., dissenting from summary affirmation). The NGA delineated specific areas of federal regulatory authority. "Section 1(b) of the NGA gave the [Federal Energy Regulatory] Commission plenary jurisdiction over three areas, and three areas only: (1) the 'transportation of natural gas in interstate commerce,' (2) the 'sale in interstate commerce of natural gas for resale,' and (3) 'natural-gas companies engaged in such transportation or sale.' " Cascade, 955 F.2d at 1416 (quoting 15 U.S.C. § 717(b)). On the other hand, "among the powers ... reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or any other consideration of legitimate local concern." Interstate Natural Gas Co. v. FPC, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947). Section 1(b) of the NGA, which defines both the grant of power to the federal government as well as the reservations of power to the states, reads as follows:
 
 
 23
 The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.
 
 
 24
 The scope of the reservation to the states of the regulation of "production or gathering" inevitably became the subject of litigation. In Northern Natural Gas Co. v. Kansas Corp. Comm'n, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), the Supreme Court addressed the issue whether a state regulation requiring an interstate pipeline company to purchase ratably from all wells connecting with its pipeline system in each gas field within the State of Kansas impermissibly encroached on federal jurisdiction. The state court had held that the regulation at issue was valid as a regulation of the production or gathering of natural gas; moreover, the purpose of the regulation was to conserve natural resources, traditionally a function of state power. The Supreme Court reversed. It held that "[t]hese orders do not regulate 'production or gathering' within [the NGA's] exemption," noting that "it has been consistently held that 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." Id. at 89-90, 83 S.Ct. at 649-50. Nor was the ratable take rule a permissible conservation measure because rather than targeting producers and production, the ratable take rule was "aimed directly at interstate purchasers and wholesales for resale." Id. at 94, 83 S.Ct. at 652. In enacting the NGA, "Congress enacted a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce....' " Id. at 91, 83 S.Ct. at 650 (quoting Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954)). The Kansas ratable-take orders posed a "danger of interference" with that scheme because the orders were
 
 
 25
 unmistakably and unambiguously directed at purchasers who take gas in Kansas for resale after transportation in interstate commerce. In effect, these orders shift to the shoulders of interstate purchasers the burden of performing the complex task of balancing the output of thousands of natural gas wells within the State.
 
 
 26
 Id. at 92, 83 S.Ct. at 651 (emphasis in original). Moreover, the "readjustment of purchasing patterns" engendered by the ratable-take orders "could seriously impair the Federal Commission's authority to regulate" the cost structure of interstate gas. Id.
 
 
 27
 By the 1970s, it became clear that the NGA's regulatory structure was inadequate. "The federally regulated prices for interstate gas sales remained consistently below the unregulated prices for intrastate gas sales. Natural gas producers found it more profitable to commit most of their supplies to the intrastate market [while] consumer demand for gas in the interstate market was artificially high...." Martin Exploration Management Co. v. FERC, 813 F.2d 1059, 1062 (10th Cir.1987), rev'd on other grounds, 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988). The resulting gas shortages prompted Congress to enact the NGPA, which the Supreme Court has repeatedly described as " 'a comprehensive statute to govern future natural gas regulation.' " Transcontinental Gas Pipe Line Corp. v. Mississippi Oil and Gas Bd., 474 U.S. 409, 420, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986) (quoting Public Serv. Comm'n of New York v. Mid-Louisiana Gas Co., 463 U.S. 319, 322, 103 S.Ct. 3024, 3032, 77 L.Ed.2d 668 (1983)). "The aim of federal regulation remains to assure adequate supplies at fair prices, but the NGPA reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand. The new federal role is to 'overse[e] a national market price regulatory scheme.' " Id. at 421, 106 S.Ct. at 716 (citations omitted) (alteration in original). The enactment of the NGPA, which removed some specific pricing regulation from the Federal Energy Regulatory Commission ("FERC"), raised some doubt whether Congress had "altered those characteristics of the federal regulatory scheme which provided the basis in Northern Natural for a finding of pre-emption." Id. at 417, 106 S.Ct. at 714. The Supreme Court explained, in the context of reviewing a "ratable-take" statutory provision, that:
 
 
 28
 Northern Natural 's finding of pre-emption ... rests on two considerations. First, Congress had created a comprehensive regulatory scheme, and ratable-take orders fell within the limits of that scheme rather than within the category of regulatory questions reserved for the States. Second, in the absence of ratable-take requirements, purchasers would choose a different, and presumably less costly, purchasing pattern. By requiring pipelines to follow the more costly pattern, Kansas' order conflicted with the federal interest in protecting consumers by ensuring low prices.
 
 
 29
 Id. at 420, 106 S.Ct. at 715. Thus, the issue raised by the NGPA was "whether Congress, in revising [the] comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the States the power it had denied FERC." Id. at 422, 106 S.Ct. at 717. The Court answered this question in the negative, holding that the NGPA "does not constitute a federal retreat from a comprehensive gas policy. Indeed, the NGPA in some respects expanded federal control, since it granted FERC jurisdiction over the intrastate market for the first time." Id. at 421, 106 S.Ct. at 716. Accordingly, in Transcontinental the Supreme Court invalidated a state ratable take order similar to the rule it had invalidated in Northern Natural. As in the earlier case, the Court noted the ratable-take order "disturbs the uniformity of the federal scheme, since interstate pipelines will be forced to comply with varied state regulations of their purchasing practices." Id. at 423, 106 S.Ct. at 717. Moreover, the Court found that the order "would have the effect of increasing the ultimate price to consumers." Id.
 
 
 30
 More recently, the Supreme Court distinguished these cases to uphold a state regulation governing the timing of production of natural gas. In Northwest Cent. Pipeline v. Kansas Corp. Comm'n, 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989), the Court upheld a Kansas regulation providing that producers' entitlements to certain quantities of gas would be permanently canceled if production were too long delayed. A pipeline had challenged the order on the ground that, "though directed to producers, it impermissibly affects interstate pipelines' purchasing mix and hence price structures...." Id. at 507, 109 S.Ct. at 1272. The Court rejected this challenge, noting that Congress, in enacting the NGA, "carefully divided up regulatory power over the natural gas industry" between the federal government and the states. Id. at 510, 109 S.Ct. at 1273. To find a state regulation of production pre-empted "merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production," as virtually any regulation of production might have "at least an incremental effect on the costs of purchasers in some ... situations." Id. at 514, 109 S.Ct. at 1276. The Court noted that "[w]e may readily distinguish Northern Natural and Transco[ntinental] " because "in both [those cases], States had crossed the dividing line so carefully drawn by Congress in NGA § 1(b) and retained in the NGPA, trespassing on federal territory by imposing purchasing requirements on interstate pipelines. In this case, on the contrary, Kansas has regulated production rates in order to protect producers' correlative rights...." Id. at 514, 109 S.Ct. at 1276.
 
 
 31
 In sum, as we have stated, "all state regulation of the purchasing or taking of natural gas by interstate pipeline companies has been pre-empted by the federal regulations contained in the Natural Gas Act and the Natural Gas Policy Act of 1978.... [T]hese two acts evidence Congress' intent to occupy the entire field of regulating natural gas purchases by interstate pipeline companies." ANR Pipeline Co. v. Corporation Comm'n of Okla., 860 F.2d 1571, 1581 (10th Cir.1988), cert. denied, 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989) (emphasis in original).
 
 
 32
 Mineral Owners urge that SB 160 falls within the "category of regulatory questions reserved for the states which include measures designed to protect the correlative rights of owners of interests in oil and gas." Br. of Appellant at 30. They contend that SB 160 is a regulation concerning the royalty owners' rights to payment under their lease agreements, and therefore does not interfere with federal regulation of interstate purchasers. We cannot agree. "[E]xceptions to the primary grant of jurisdiction in [section 1(b) ] are to be strictly construed." Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 679, 74 S.Ct. 794, 797, 98 L.Ed. 1035 (1954) (quotation omitted). While the purpose of SB 160 is undoubtedly to protect the rights of royalty interest owners, it does not purport to regulate the physical "production" or "gathering" of natural gas. Rather, it is "unmistakably and unambiguously directed at purchasers," Northern Natural, 372 U.S. at 92, 83 S.Ct. at 651, and imposes obligations upon their purchase of natural gas which will substantially and materially influence their purchasing decisions.[7]
 
 
 33
 Under SB 160, interstate pipelines purchasing natural gas are ultimately responsible for ensuring that all royalty owners within a drilling and spacing unit receive their royalty payments. Just as the ratable take orders in Northern Natural "shift[ed] to the shoulders of interstate purchasers the burden of performing the complex task of balancing the output of thousands of natural gas wells within the State," 372 U.S. at 92, 83 S.Ct. at 651, SB 160 shifts to interstate purchasers the burden of ensuring that all royalty owners within a unit receive all payments to which they are entitled under their leases. In affidavits submitted to the district court in support of their motion for summary judgment, Purchasers detailed the extent of this burden. Representatives for several pipeline companies averred that under their existing contracts, they do not know who the royalty owners are to whom they would be liable nor do they know the nature and extent of the royalty owners' interests. Thus, Purchasers would be required to incur a significant cost to implement a system and hire a staff to obtain and maintain title information to disburse royalty proceeds. This cost could cause the Purchasers to reallocate their purchases, particularly when they purchase only a small percentage of gas from a well or when there are other problems calculating royalty owners' interests. Appellee ANR Pipeline, for example, currently has a staff of five persons who administer contracts for over 3,000 wells from which ANR purchases gas, approximately 1,490 of which are in Oklahoma. According to ANR Pipeline, it would be "physically impossible" for this staff to directly disperse royalty proceeds. Appellee Northwest Central Pipeline Corporation (presently Williams Natural Gas Company) provided similar affidavit testimony. Each purchaser would have to maintain updated unit-wide title information, so that where multiple purchasers took from a single unit they would be duplicating one another's work and expense. Were Purchasers to attempt to avoid the costs of directly dispersing royalties by contracting with producers to make such payments, they would still incur the costs of processing and defending legal claims arising out of disputes over the dispersion of royalty interests.[8]
 
 
 34
 Finally, as Appellants themselves pointed out to the district court, SB 160 "transfer[s] the burden of the risk of the insolvency of lessees from the royalty owners to the ... Purchasers." Appellants' App., Vol. II, at 476. In addition to forcing the purchasers to assume the task of bookkeeping for an oil and gas unit, SB 160 imposes on purchasers joint and several liability for payments owed to all royalty interest owners in the unit. A purchaser's liability is not limited to the payments owed under its own contracts with producers, nor, indeed, is it limited to payments owed to those holding royalty interests in the gas or oil purchased under its own contracts. Rather, SB 160 holds purchasers ultimately liable for payment to "any royalty owner" in a unit, including payment of royalties for gas and oil purchased by other purchasers within the unit and other lessor-lessee money obligations entirely unrelated to the purchase of gas and oil.
 
 
 35
 For these reasons, we also reject Appellants' alternative argument that "[i]f SB 160 is preempted because it increases the costs of the purchasers, any state requirements placed on purchasers would likewise be preempted" and the "purchasers could avoid all state regulation." Reply Br. of Appellants at 17. It is indisputable that "every state statute that has some indirect effect on [areas within federal control] is not preempted." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 308, 108 S.Ct. 1145, 1155, 99 L.Ed.2d 316 (1988). SB 160 does not, however, merely have "some indirect effect" on interstate pipelines; rather, it directly regulates interstate pipeline companies in their purchase of natural gas by rendering them liable to all royalty owners in an entire drilling and spacing unit regardless of whether they have complied with their obligations to parties with whom they have contracted. We therefore hold that SB 160 may not validly be applied to interstate pipelines engaged in the purchase of natural gas.
 
 II. Severability
 
 36
 Having concluded that SB 160 is preempted insofar as it burdens interstate pipeline companies engaging in the purchase of natural gas, we must determine whether the portion of the statute which we find invalid may be severed from the remainder of the statute. The severability of a statute is an issue of state law. Jane L. v. Bangerter, 61 F.3d 1493, 1497 (10th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 2067, --- L.Ed.2d ---- (1996). Although SB 160 does not contain a severability clause, "[s]everability of the non-offending sections ... does not necessarily depend on the presence of the clause." Ethics Comm'n of Oklahoma v. Cullison, 850 P.2d 1069, 1077 (Okla.1993). Rather, the determination of severability must be guided by Okla. Stat. tit. 75, § 11a (1995), which provides in relevant part:
 
 
 37
 2. For acts enacted prior to July 1, 1989, whether or not such acts were enacted with an express provision for severability, it is the intent of the Oklahoma Legislature that the act or any portion of the act or application of the act shall be severable unless:
 
 
 38
 * * *
 
 
 39
 b. the court finds the valid provisions of the act are so essentially and inseparably connected with and so dependent upon the void provisions that the court cannot presume the Legislature would have enacted the remaining valid provisions without the void one....
 
 
 40
 Our preemption analysis voids only the portions of SB 160 imposing liability on first purchasers, and only when those first purchasers are interstate pipelines engaged in the purchase of natural gas for resale in interstate commerce. We thus must determine whether these portions of the act are "so essentially and inseparably connected with and so dependent upon" the liability of interstate gas purchasers that we cannot presume the Legislature would have enacted these provisions without such liability.
 
 
 41
 The purpose of SB 160 was to facilitate the payment of royalties to entitled royalty interest owners. The legislation did not merely recalculate the royalty interest due but unambiguously imposed liability for the payment of this interest on a single, identifiable party: the first purchaser. That the Legislature intended SB 160 to be a mechanism to enlist purchasers as insurers of the contemplated royalty payments is made clear by the repetition throughout the legislation of provisions placing liability on purchasers. In light of this clear legislative intent,[9] we believe that severing the statute would be inappropriate because the remaining provisions are so inseparably connected with and so dependent upon the void provisions that it is apparent the legislature would not have enacted the remaining valid provisions without the void ones. Kinney v. Board of County Comm'rs, 894 P.2d 444, 448 (Okla.App.1995).[10]
 
 
 42
 That the Legislature would have enacted only the non-preempted portions of SB 160 appears further unlikely in light of the legislation that in fact repealed and replaced SB 160. Senate Bill 168, the Production Revenue Standards Act, accomplishes the same purposes as SB 160, but explicitly provides that "[n]othing in the Production Revenue Standards Act shall: ... Set the price, terms or conditions under which a purchaser takes the production or set any restrictions, limitations, floor or ceiling on the price to be paid for such production." Okla. Stat. tit. 52, § 570.9(E)(3) (Supp.1996). In removing the burden of royalty payments from first purchasers, the Legislature did not retain the royalty calculation challenged in SB 160. Rather, SB 168 contains a careful and complex scheme whereby each producer pays the "royalty share" out of the proceeds received from its sales of gas production, see Okla. Stat. tit. 52, § 570.4(B), and is reimbursed for any excess royalty burden by being permitted to produce and separately dispose of its correspondingly increased "proportionate production interest" in monthly production, see id. §§ 570.2(4), 570.9(A). Given that the Oklahoma Legislature did not merely enact the equivalent of a sanitized or stripped down version of SB 160 when it had the opportunity to do so, we are doubtful that we would be serving legislative intent by allowing such a version to stand. We therefore conclude that SB 160 is not severable and must fall in its entirety.[11]
 
 Conclusion
 
 43
 Because we find that portions of SB 160 are preempted, and we cannot presume that the Oklahoma Legislature would have enacted the non-preempted language standing alone, we hold that the statute is invalid in its entirety. We therefore do not reach the remaining issues on appeal: namely, whether the Legislature intended SB 160 to apply to existing contracts, or whether SB 160 violates the Commerce Clause, the Contracts Clause, or the Fourteenth Amendment. The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 It may be that the district court also held that SB 160 violated the Commerce Clause, as the parties seem to assume. However, such a ruling cannot be found in either the court's July 1994 order or judgment or in its June 1995 modified judgment. In any event, because we agree that SB 160 is unconstitutional under the Supremacy Clause, we do not reach either the Commerce Clause issues or the other constitutional challenges
 
 
 [2]
 The exception is Public Service Company of Oklahoma, which is concededly not an interstate pipeline company as defined by the Natural Gas Act and Natural Gas Policy Act. Accordingly, Public Service Company did not raise the preemption or Commerce Clause claims raised by the remaining Purchasers
 
 
 [3]
 Although both district judges to consider this case stated that this fact was not in dispute, Mineral Owners claim that this fact was disputed below. They point out that this was listed as a "disputed fact" in the parties' Joint Status Report of June 9, 1993. However, we find nothing in the record to support this characterization. As we note infra, while non-appealing party CLO did offer an affidavit that under some contracts Purchasers remit royalties directly to royalty owners, no evidence appears to have been offered to controvert affidavits by Purchasers that under the majority of their gas purchase contracts there was no direct liability from the Purchasers to the Royalty Owners
 
 
 [4]
 A preexisting statute, enacted in 1980, did impose royalty obligations on first purchasers, although it allowed them to transfer those obligations to the producers. Okla. Stat. tit. 52, § 540 provided in relevant part:
 A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto.... Such payment is to be made to persons entitled thereto by the first purchaser of such production.... The first purchaser shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease ... shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto.
 (Supp.1981-82). Section 540, which has been amended and recodified as Okla. Stat. tit. 52, § 570.10, is not at issue in this appeal except insofar as it was amended by SB 160. We therefore do not address its constitutionality. We note, however, that SB 160 places significant additional burdens on first purchasers beyond those imposed by Section 540 before the amendment. First, under SB 160, a purchaser remains liable to royalty owners regardless of whether it has contracted with a producer for the producer to assume such liability. Indeed, a purchaser is liable for all royalty payments even though it may have no contractual relationship whatsoever with some owners and producers within the unit. Similarly, because legal liability remains with the purchaser at all times, it is the purchaser's burdensome responsibility to ascertain the identities and interests of all royalty owners in a unit and to ensure that those royalty owners get paid. Further, to the extent that SB 160 amends the calculation of royalties owed to royalty owners to include royalties in addition to the "normal 1/8," it is purchasers who are required to make these complex calculations and to ensure the proper distribution of these royalty payments. Finally, each purchaser is made jointly and severally liable with each other purchaser in the unit so that each purchaser is required not only to make its own payments correctly but is also required to monitor the payments of all other purchasers in the unit.
 Mineral Owners note that while SB 160 was in effect, Section 540 provided that first purchasers could escape liability for royalty payments by contracting with producers to assume this responsibility. They argue that "[n]othing in SB 160 precludes the purchasers from entering into such agreements." Br. of Appellants at 37. However, Section 540 provided only that a purchaser who so contracts "shall be exempt from the provisions of this subsection;" it did not address a purchaser's liability under section 87.1 as amended by SB 160. Further, we find section 87.1's imposition on first purchasers of joint and several liability for royalty payments to be inconsistent with a legislative intent to allow parties to contract around its provisions.
 
 
 [5]
 Appellant OMOA suggested before the district court (and suggests here) that SB 160 and SB 168 do not conflict, and that compliance with SB 168 satisfies SB 160. They therefore suggest that the alleged constitutional deficiencies of SB 160 can be eliminated by reading the statutes together. While SB 168 is retroactive in that it applies to all contracts and wells as of its effective date, see Okla. Stat. tit. 52, § 570.3 (Supp.1996), it does not purport to reach back and cover the period between 1985-1993. Nor may SB 160 reasonably be "construed" to include the language in SB 168 that cured the alleged constitutional defects: an explicit scheme for compensating producers, and explicit language relieving purchasers of liability
 
 
 [6]
 The district court found preemption on two grounds: (1) the challenged statutes would force interstate pipelines to "comply with varied state regulations of their purchasing practices, thus disrupting the federal scheme"; and compliance by interstate pipelines with the challenged statutes "would have the effect of increasing the ultimate price to consumers which frustrates the federal goal of insuring low prices." Order of Judge Cauthron, Appellant App., Vol. III, at 846
 
 
 [7]
 We find misplaced, therefore, Mineral Owners' reliance on Mobil Oil Corp. v. FPC, 463 F.2d 256 (D.C.Cir.1971), cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 2410, 2413, 32 L.Ed.2d 676 (1972). There, the District of Columbia Circuit held that the royalty provisions of an oil and gas lease are not "sales" subject to the NGA, and that the NGA does not provide "any basis for the FPC's reaching out to cover the landowner's lease or its royalty payments." Id. at 263. The court reasoned that a landowner's lease precedes sales in interstate commerce and "indeed even precedes the 'production and gathering' which § 1(b) visualized as preceding the sale in interstate commerce over which jurisdiction was being established." Id. at 262. The court also noted, however, that "[w]hen there is a sale of gas to a pipeline in interstate commerce, the FPC will of course have the jurisdiction and the responsibility to exercise control in the interest of the ultimate consumer." Id. at 263. The contested liability provisions of SB 160, while facilitating the rights of royalty owners, are triggered by a sale of gas to a pipeline in interstate commerce. Mobil Oil therefore does not support the constitutionality of SB 160
 
 
 [8]
 Mineral Owners protest that whether SB 160 imposes costs on Purchasers is a disputed issue of material fact precluding summary judgment. They rely on affidavits submitted by non-appealing defendant CLO in objection to plaintiff's motions for summary judgment. In 1987, CLO submitted an affidavit averring that plaintiff Purchasers currently remitted to the CLO its royalty interest on 68 leases. In 1993, CLO submitted affidavits contesting the substance of an affidavit in support of plaintiff's supplemental brief for summary judgment. In these, CLO contested Purchasers' construction of their contracts and also offered its own calculation of how much it would cost Purchasers to remit royalties: the affiant concluded "the up front costs are less than $20,000 and the monthly fees should be less than $1,500 a month."
 Mineral Owners themselves did not assert that summary judgment was inappropriate because of the existence of disputed facts, nor did they "set forth specific facts showing that there is a genuine issue for trial." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). Assuming arguendo that they may rely on appeal on the motions and documentation of their non-appealing coparty, we do not believe CLO raised a genuine issue of material fact. Purchasers have conceded that they remit royalties directly under some leases; however, their claim that this is not so in the vast majority of leases has not been controverted. In any event, the precise quantum of the cost to Purchasers is not at issue in this case. It has not been disputed that the purpose of SB 160 is to burden purchasers with costs previously borne by royalty owners.
 
 
 [9]
 While we believe the legislative intent is clear from the face of the statute, our conclusion draws further support from the Senate Debate on SB 160. See, e.g., Statement of Senator Giles, Senate Debate on Senate Bill 160, May 30, 1985, at 24:
 [I]f you did not have the [language making purchasers liable], you would still have the operator paying part of the proceeds to the royalty owners, and the lessee paying other parts and so forth under existing contracts and existing law. So you've got to have both [the royalty calculation and the liability provisions] to make the overall problem be cured, basically. Otherwise, there is no one individual or no one entity that's responsible for payment, and the royalty owner is still going to be where he is today and looking to different parties for payment of different prices.
 (Producers' Supp.App. at 27).
 
 
 [10]
 Although SB 160 benefits royalty owners under both oil and gas leases, the parties agree that the problem SB 160 was enacted to solve arose primarily because of disproportionate production of natural gas. See, e.g., Br. of Appellants at 10 ("During the early 1980s, many working interest owners were unable to sell their share of gas produced from a unit well and many mineral owners did not receive payment."); Br. of Purchasers at 5 n.2 ("[I]t may be that there has been less effort to enforce [SB 160] when there has been proportionate production, as there generally is in the production of crude oil, and less frequently in the context of gas."). Thus, even assuming SB 160 were valid as to purchasers of oil, or purchasers of oil and only intrastate purchasers of natural gas, we have no confidence that the Legislature would have chosen to enact such a version of the legislation. Thus, we must declare SB 160 void in its entirety
 
 
 [11]
 Appellant Mineral Owners have requested that we certify several questions to the Oklahoma Supreme Court pursuant to Okla. Stat. tit. 20, § 1602 (Supp.1996) (that court may answer a question of law certified by a United States Court of Appeals "if there are involved in any proceeding before [the certifying court] questions of law of this state which may be determinative of the cause then pending ... as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court or Court of Criminal Appeals of this state"). None of the questions specified are determinative of the issue of preemption. Nor do we believe that the Oklahoma Supreme Court could construe the challenged provisions of SB 160 in such a way as to avoid their being preempted by federal law. We therefore deny the motion for certification