**In re: WESTERN STATES WHOLE-SALE NATURAL GAS ANTI-TRUST LITIGATION**

**J.P. Morgan Trust Company, National Association, in its Capacity as Trustee of FLI Liquidating Trust, Plaintiff,**

v.

**The Williams Companies, Inc., et al., Defendants.**

No. MDL 1566.
Nos. 2:03–CV–01431–PMPPAL,
2:05–CV–01331–PMPPAL.

United States District Court,
D. Nevada.

Dec. 18, 2006.

Donald D. Barry, Barry Law Offices, L.L.C., Topeka, SK, Eric I. Unrein, Davis, Unrein, McCallister, Biggs & Head, L.L.C., Topeka, KS, Gary D. McCallister,

Gary D. McCallister & Associates, Ltd, Chicago, IL, Isaac L. Diel, Isaac L. Diel Law Offices, Law Offices of Isaac L. Diel, Bonner Springs, KS, Thomas H. Brill, Law Office of Thomas H. Brill, Mission Hills, KS, for JP Morgan Trust Company, NA, Plaintiff.

Robert B. Wolinsky, Steven J. Routh, Hogan & Hartson, LLP, Washington, DC, Orrin L Harrison, III, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, Mark E Haddad, Sidley Austin LLP, Los Angeles, CA, Joshua D. Lichtman, Fulbright & Jaworski, L.L.P., Los Angeles, CA, Joel B. Kleinman, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, Jerome T. Wolf, Sonnenschein Nath & Rosenthal LLP, Kansas City, MO, Leslie H. Spiegel, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, Douglas R. Tribble, Pillsbury Winthrop Shaw Pittman LLP, San Diego, CA, John M. Grenfell, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA, Joseph Duffy, Morgan Lewis & Bockius, Los Angeles, CA, Diane E. Pritchard, Morrison & Foerster, San Francisco, CA, Oliver S Howard, Amelia A Fogleman, Gable & Gotwals, Mason G Patterson, Gable & Gotwals, Tulsa, OK, Joseph P. Hardy, Bullivant Houser Bailey, PC, Las Vegas, NV, James E Scarboro, Jessica Brody, Matthew Douglas, Arnold & Porter, Denver, CO, Jeffrey M. Shohet, DLA Piper Rudnick Gray Cary U.S. LLP, San Diego, CA, for AEP Energy Services, Inc., American Electric Power Company, Inc., Centerpoint Energy Inc., CMS Energy Corporation, CMS Field Services, CMS Marketing, Service & Trading Company, Coral Energy Resources, LP, Duke Energy Corporation, Duke Energy Trading & Marketing, LLC, Dynegy Marketing & Trade, e prime Inc., El Paso Corporation, El Paso Merchant Energy LP, Oneoak, Inc., Oneok Energy Marketing & Trading

Company, LP, Reliant Energy Services, Reliant Energy, Inc., Western Gas Resources, Inc., Williams Companies, Inc., Williams Energy Marketing & Trading Company, Williams Merchant Services Company, Inc., Xcel Energy Inc., Defendants.

### ORDER

PRO, Chief Judge.

Presently before this Court is Defendants' Motion to Dismiss (2:05–CV–01331, Doc. # 32), filed on June 22, 2006. Plaintiff filed an Opposition (2:05–CV–01331, Doc. # 38) on August 4, 2006. Defendants filed a Reply (2:05–CV–01331, Doc. # 41) on August 18, 2006.

## I. BACKGROUND

This case is one of many in consolidated Multi District Litigation arising out of the energy crisis of 2000–2001. During that time, the national energy and natural gas markets became mutually dysfunctional, and, feeding off each other spiraled into a nationwide energy crisis. *Amendments to Blanket Sales Certificate*, 105 F.E.R.C. ¶ 61,217, at ¶ 12, 2003 WL 22758080 (2003). The Federal Energy Regulatory Commission ("FERC") undertook a fact finding investigation of the market crisis in which it concluded, "spot gas prices rose to extraordinary levels, facilitating the unprecedented price increase in the electricity market." *Id.* FERC found the dysfunctions in the natural gas market stemmed from efforts to manipulate price indices compiled by private trade publications, including reporting of false data and wash trading.[1] *Id.*

Plaintiff originally filed this action in the District Court of Wyandotte County, Kansas. (Notice of Removal, [2:05–CV–01331, Doc. # 1] at 2.) Defendants removed the case to the United States District Court for the District of Kansas. (*Id.*) The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.

In this litigation, Plaintiff sues Defendants seeking to recover damages on behalf of natural gas rate payers. In the Amended Complaint, Plaintiff alleges Defendants engaged in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers. (Am. Compl. [2:05–CV–01331, Doc. # 11] at 35–36.) Specifically, Plaintiff alleges Defendants knowingly delivered false reports concerning trade information and engaged in wash trades, which conduct violated Kansas Statutes Annotated § 50–101, et. seq ("Kansas antitrust statutes"). (*Id.* at 35.)

Plaintiff J.P. Morgan Trust Company Association ("J.P.Morgan") is the trustee for reorganized FLI, Inc. ("FLI"), a Kansas corporation with its principal place of business in Kansas City, Missouri. (*Id.* at 3.) J.P. Morgan brings this suit in its capacity as FLI's trustee. FLI is a successor in interest to Farmland Industries, Inc., a Kansas corporation, with its principal place of business in Kansas. (*Id.* at 3–4.) According to the Amended Complaint, Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates'

---

1. "A 'wash trade' is a prearranged pair of trades of the same good between parties, resulting in no net change in ownership. It creates an illusion of a more liquid and active market and it helps bolster false trading revenue figures." Federal Regulatory Commission, *Commission Revoked Enron's Market–Based Rate Authority, Blanket Gas Certificates Terminated*, (June 25, 2003), at http://www.ferc.gov/press–room/pr–archives/2003/2003–2/06–25–03_enron.pdf.

production, in the United States and in the State of Kansas. (*Id.* at 4–33.)

Under Federal Rule of Civil Procedure 12(b)(6), Defendants now move to dismiss Plaintiff's Amended Complaint arguing the filed rate doctrine bars Plaintiff's claim and the Natural Gas Act ("NGA") preempts Plaintiff's claim. Defendants argue that because Plaintiff's allegations are essentially the same as those allegations asserted in other cases this Court already has dismissed on the basis of the filed rate doctrine, the Court should dismiss this case as well. In addition, Defendants assert that even if the filed rate doctrine does not apply, the Court should dismiss Plaintiff's Amended Complaint pursuant to the doctrines of field preemption and conflict preemption. Plaintiff responds that the filed rate doctrine does not apply to this case because the Kansas antitrust statutes under which Plaintiff brings suit do not require the Court to determine the extent to which Defendants' alleged misconduct artificially raised prices in the natural gas market. Further, Plaintiff argues federal preemption does not apply to state antitrust laws.

## II. LEGAL STANDARD

In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998) (citation omitted). However, the Court does not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the plaintiff's complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–55 (9th Cir.1994). There is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th

Cir.1997) (citation omitted). The issue is not whether the plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. *Id.* (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Hicks v. Small,* 69 F.3d 967, 969 (9th Cir.1995).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. *See Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1481 (9th Cir. 1997) (quoting *Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. 99). All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. *See United States v. Howell,* 318 F.2d 162, 166 (9th Cir.1963).

## III. DISCUSSION

Defendants assert two alternative bases for dismissal in response to Plaintiff's allegations of knowingly reporting false gas prices and engaging in wash trades in the natural gas market. First, Defendants argue this Court's previous dismissal orders in *In re Western States Wholesale Natural Gas Antitrust Litigation,* 368 F.Supp.2d 1110 (D.Nev.2005) ("*Texas–Ohio* "), and *In re Western States Wholesale Natural Gas*

*Antitrust Litigation,* 408 F.Supp.2d 1055 (D.Nev.2005) ("*Abelman*") necessitate dismissal in this case because Plaintiff's allegations are essentially the same as the allegations in those cases. This Court ruled in *Texas–Ohio* and *Abelman* that the filed rate doctrine barred the plaintiffs' claims because the damages the plaintiffs sought would require the Court to determine what a just and reasonable rate would have been in the wholesale natural gas market absent the defendants' alleged misconduct, thereby usurping a function Congress explicitly assigned to FERC. Plaintiff argues the filed rate doctrine does not apply to this case because the Kansas antitrust statutes under which it brings suit contain a unique "full consideration" provision as a measure of calculating damages and therefore do not require the Court to speculate upon what rates would have been charged in the natural gas market. Second, Defendants argue the NGA preempts Plaintiff's state law claims. Plaintiff responds that pursuant to this Court's previous Orders, the NGA does not preempt state law antitrust claims.

### A. "Complete" Preemption vs. "Field" or "Conflict" Preemption

Plaintiff argues the Court already considered and rejected Defendants' preemption arguments in *In re Western States Wholesale Natural Gas Antitrust Litigation* ("*In re Western States*") when it ruled "[n]o federal court has found the Natural Gas Act, the Federal Power Act, or the Natural Gas Policy Act (NGPA) preempt state regulation of the natural gas industry." 346 F.Supp.2d 1123, 1132 (D.Nev.2004). Defendants respond that the Court never has reached the issue of "field" or "conflict" preemption as a defense in any of its prior rulings. Instead, Defendants argue this Court's previous orders dealt with the conceptually separate question of whether the doctrine of "com-plete" preemption converted the plaintiffs' state law claims into a federal claim for purposes of removal jurisdiction.

■ The doctrine of complete preemption is a jurisdictional doctrine under which "federal occupation of the field necessarily converts all state law claims into federal claims[.]" *Hendricks v. Dynegy Power Mktg., Inc.,* 160 F.Supp.2d 1155, 1158 (S.D.Cal.2001); *see also Botsford v. Blue Cross & Blue Shield,* 314 F.3d 390, 393 (9th Cir.2002) (stating that "[t]o preempt state-law causes of action completely, federal law must both: (1) conflict with state law (conflict preemption) and (2) provide remedies that displace state law remedies (displacement)."). Complete preemption is rare. *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.,* 213 F.3d 1108, 1114 (9th Cir.2000). In fact, federal courts seldom have identified legislation which preempts completely state law causes of action. *See, e.g. Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (Employee Retirement Income Security Act). Unlike complete preemption, field and conflict preemption are defenses on the merits to state law causes of action and do not confer federal jurisdiction. *ARCO,* 213 F.3d at 1114.

This Court recognized the difference between these two types of preemption doctrines in *In re Western States.* In that case, the defendants removed the plaintiffs' California state law actions to federal court arguing, among other things, that the NGA completely preempted state court jurisdiction. The Court rejected the defendants' argument finding that "no such complete preemption language appears" in the NGA and that "[n]o federal court has found the Natural Gas Act, the Federal Power Act, or the Natural Gas

Policy Act (NGPA) preempt state regulation of the natural gas industry." *In re Western States,* 346 F.Supp.2d at 1132. The Court also recognized that field preemption, conflict preemption, and the filed rate doctrine were insufficient to confer federal removal jurisdiction because they are defenses on the merits. *Id.* at 1137. Here, Defendants raise the defense of field preemption, which this Court has not yet considered.

## B. Field Preemption

Defendants argue Plaintiff's state law claim is preempted because Defendants' alleged misconduct occurred within the "federally-occupied field of interstate sales and transportation of natural gas," over which FERC has exclusive control. (Defs.' Mot. to Dismiss & Mem. in Support of Mot. to Dismiss at 4.) Moreover, Defendants argue FERC is actively regulating the type of conduct alleged in the Amended Complaint pursuant to its authority under the NGA. Plaintiff urges the Court to apply its reasoning in *In re Western States* with respect to complete preemption to the present case and deny Defendants' motion.

 "Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, of the United States Constitution." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.,* 295 F.3d 918, 928 (9th Cir.2002). Whether federal law preempts state law is a matter of congressional intent. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Generally, there are three situations in which state law must yield to federal law. First, federal law preempts state law when Congress expressly so provides. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Next, under the doctrine of field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). Finally, under the doctrine of conflict preemption, even "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still preempted when it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law . . . or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (internal quotations omitted).

The NGA does not contain an express provision preempting state law. Consequently, express preemption does not apply. As for implied preemption, when Congress evidences an intent to occupy "a given field or an identifiable portion of it . . ., the test of preemption is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.' " *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 212–13, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 236, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). "The metaphor 'occupy the field' is strongly associated with, and often taken to automatically entail, exclusive federal control." *In re Cal. Wholesale Elec. Antitrust Litig.,* 244 F.Supp.2d 1072, 1082 (S.D.Cal.2003) (citing *Public Util. Comm'n of Cal. v. FERC,* 900 F.2d 268, 274 (D.C.Cir.1990)).

In the context of natural gas, Congress intended to create an effective and comprehensive dual regulatory scheme that recognized the states' authority to regulate certain natural gas transactions as well as the federal government's authority over interstate commerce. *Panhandle E. Pipe Line Co. v. Public Serv. Comm'n of*

*Indiana,* 332 U.S. 507, 520–21, 68 S.Ct. 190, 92 L.Ed. 128 (1947). Through the NGA, Congress granted to FERC jurisdiction over matters relating to the transportation of natural gas in interstate commerce, the sale of natural gas in interstate commerce for resale, and the natural gas companies engaged in such transportation or sales. 15 U.S.C. § 717; *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 305, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). Where Congress has granted FERC jurisdiction, "that jurisdiction is exclusive." *In re Cal. Wholesale Elec. Antitrust Litig.,* 244 F.Supp.2d at 1076; *Miss. Power & Light Co. v. Miss. ex rel. Moore,* 487 U.S. 354, 377, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J. concurring) (stating that "it is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject."); *Public Util. Comm'n of Cal.,* 900 F.2d at 274 (explaining that "if there be [FERC] jurisdiction over some component of the transaction, it is exclusive over the component."). Accordingly, "[t]he 'bright line' division of authority adopted by Congress precludes any attempt to inject state law into areas reserved to FERC." *In re Cal. Wholesale Elec. Antitrust Litig.,* 244 F.Supp.2d at 1076.

Applying the doctrine of field preemption, the United States Supreme Court has rejected states' attempts to regulate those areas within FERC's exclusive jurisdiction. For example, in *Schneidewind,* the Supreme Court held the NGA preempted a Michigan law requiring public utilities transporting natural gas in Michigan for public use to get approval from the Michigan Public Service Commission before they could issue long-term securities. 485 U.S. at 296–97, 300, 108 S.Ct. 1145. The Court found the NGA granted FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale. *Id.* at 300–01, 108 S.Ct. 1145. Consequently, the Court had to decide whether the Michigan law "regulate[d] within this exclusively federal domain." *Id.* at 305, 108 S.Ct. 1145 (emphasis omitted). In finding that federal preemption barred application of the Michigan law, the Court concluded that the Michigan law's objectives were the same as those sought by the NGA, the Michigan law was directed at "precisely the things over which FERC has comprehensive authority," and "the NGA has equipped FERC adequately to address the precise concerns [the Michigan law] purports to manage." *Id.* at 307–09, 108 S.Ct. 1145. Further, elaborating on the related doctrine of conflict preemption, the Court stated that where a state law affects FERC's ability to regulate uniformly and comprehensively or presents the "prospect of interference" with FERC's regulatory power, "then the state law may be preempted even though collision between the state and federal regulation may not be an inevitable consequence." *Id.* at 310, 108 S.Ct. 1145 (internal quotations omitted).

■ Here, the objectives sought by the Kansas antitrust statutes are the same as those sought by the NGA. The primary purpose of the NGA is "to protect consumers against exploitation at the hands of natural gas companies." *Fed. Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Accordingly, Congress "meant to create a comprehensive and effective regulatory scheme," that would "afford consumers a complete, permanent and effective bond of protection from excessive rates and charges" in the interstate gas market. *Panhandle E. Pipe Line Co.,* 332 U.S. at 520, 68 S.Ct. 190; *Atl. Ref. Co. v. Pub. Serv. Comm'n of New York,* 360 U.S. 378, 388, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). As part of its regulatory scheme, the NGA gives "FERC exclusive jurisdic-

tion over the transportation and sale of natural gas in interstate commerce for resale." *Schneidewind,* 485 U.S. at 300–01, 108 S.Ct. 1145; *see also Ill. Natural Gas Co. v. Central Ill. Pub. Serv. Co.,* 314 U.S. 498, 507, 62 S.Ct. 384, 86 L.Ed. 371 (1942) (stating that Congress intended for the NGA "to occupy th[e] field" of wholesale sales in interstate commerce). The purpose of Kansas Statutes Annotated chapter 50, as its title points out, is to prevent unfair trade and to provide consumer protection. More specifically, the Kansas legislature designed the antitrust statutes to prevent conspiratorial conduct intended to control "trade, transportation, production, price, or traffic in commercial commodities." *State v. Int'l Harvester Co. of Am.,* 79 Kan. 371, 99 P. 603, 606 (1909). Both statutory schemes are aimed at protecting consumers from exploitative conduct in the areas of transportation, pricing, and sales of natural gas.

Further, the Kansas antitrust statutes are directed at matters over which FERC has exclusive control pursuant to its authority under the NGA. Under section one of the NGA (15 U.S.C. § 717), FERC has jurisdiction over natural gas companies engaged in the transportation or sale of natural gas in interstate commerce for resale. To engage in such sales, section seven of the NGA requires a natural gas company to obtain FERC's authorization in the form of a certificate of public convenience and necessity. 15 U.S.C. § 717(f)(c)(1)(A). The NGA grants FERC the power to "to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." 15 U.S.C. § 717(f)(e). The NGA also charges FERC with the responsibility of ensuring that natural gas companies within its jurisdiction charge rates that are just and reasonable. 15 U.S.C. § 717(c). To this end, the NGA

gives FERC the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." 15 U.S.C. § 717(*o*).

As a result of various changes in the natural gas industry, including Congressional legislation aimed at deregulation, FERC decided, pursuant to its authority under section seven of the NGA, to issue blanket certificates allowing pipelines and other persons selling natural gas to make wholesale sales at negotiated or market-based rates. *Amendments to Blanket Sales Certificate,* 105 F.E.R.C. ¶ 61,217, at ¶ 7 (2003), *rehearing denied,* 107 F.E.R.C. ¶ 61,174 (2004); 18 C.F.R. § 284.402(a). The purpose of the blanket certificates was to "foster a truly competitive market for natural gas sales for resale in interstate commerce, giving purchasers of natural gas access to multiple sources of natural gas and the opportunity to make gas purchasing decisions in accord with market conditions." *In re Amendments to Blanket Sales Certificates,* 107 F.E.R.C. 61,174, at ¶ 12 (2004) (internal quotation omitted). While FERC's decision to issue blanket certificates was another step toward deregulation of the natural gas market, that does not mean FERC's jurisdiction or ability to re-institute regulations in the interstate wholesale market diminished. Further, the deregulation of the natural gas market does not imply Congress no longer intended to occupy the field of matters relating to the interstate wholesale market. *See Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.,* 474 U.S. 409, 422, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986) (explaining that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as

much preemptive force as a decision *to regulate*") (internal quotation omitted) (emphasis in original).

FERC's issuance "of certificate authority to make jurisdictional sales of natural gas implicitly prohibited acts which would manipulate the competitive market for natural gas." *In re Amendments to Blanket Sales Certificates*, 107 F.E.R.C. 61,174, at ¶ 12. Consequently, FERC maintained the power not only to monitor the market to ensure that market based rates remained just and reasonable under the NGA, but also to condition and terminate a seller's certificate for misconduct. *Id.* at ¶¶ 6, 11; *see also Regulations Governing Blanket Marketer Sales Certificates*, 57 Fed. Reg, 57,952, 57,958 (Dec. 8, 1992) (codified in 18 C.F.R. part 284) (stating FERC will "monitor the operation of the market through the complaint process."); *Wyoming–California Pipeline Co.*, 70 F.E.R.C. ¶ 61,041, 61,130, 1995 WL 19972 (1995) (explaining "there can be *no* question that the Commission has the authority to revoke a certificate for violation of its terms.") (emphasis in original); *Enron Power Mktg. Inc.*, 103 F.E.R.C. ¶ 61,343, at ¶ 70 (2003) (stating that for FERC to carry out the NGA's purposes, "it must have the authority to terminate a certificate when the holder violates the certificate by deliberately engaging in misconduct that undermines the basic purpose for issuing the certificate in the first instance."). However, "[i]n light of the market manipulations in the West in 2000–2001, which occurred despite the implicit prohibitions in gas certificate authorizations ..., the Commission found it necessary, in order to ensure the competitiveness of the market, to explicitly prohibit acts intended to manipulate the natural gas market ...." *In re Amendments to Blanket Sales Certificates*, 107

F.E.R.C. 61,174, at ¶ 12. As a result, in 2003, FERC made explicit what was once implicit by issuing Order No. 644, which amended the blanket certificates so as to integrate a code of conduct expressly prohibiting "jurisdictional sellers from undermining the competitiveness of the marketplace by engaging in abusive or manipulative acts," such as wash trades, collusion, and false reporting to price indices. *Id.* at ¶ 17.

FERC issued Order No. 644 pursuant to its power under sections five, seven, and sixteen of the NGA *without any additional authorizing legislation.* Order No. 644 summarizes FERC's regulatory scheme as follows:

> Under [18 C.F.R. § 284.403] ... any person making natural gas sales for resale in interstate commerce ... is prohibited from engaging in actions without a legitimate business purpose that manipulate or attempt to manipulate market conditions, including wash trades and collusion.
>
> To the extent [such a person] ... engages in reporting of transactions to publishers of gas price indices, [it] shall provide complete and accurate information to any such publisher ....

*Amendments to Blanket Sales Certificate*, 105 F.E.R.C. ¶ 61,217, at ¶¶ 4–5 (2003).

FERC's code of conduct was based in part on FERC's *Price Discovery in Natural Gas & Electric Markets* in which FERC issued a Policy Statement after "exploring the process by which price indices influence and reflect the formation of wholesale prices for natural gas and electricity." 104 F.E.R.C. 61,121, at ¶ 1 (2003). In the Policy Statement, FERC stated that it has "broad authority under Sections 14(a) and 16 of the Natural Gas

Act[2] ... to investigate and gather relevant data and to make such orders, rules and regulations as may be necessary to carry out the provisions of the NGA." *Id.* at ¶ 44. Accordingly, FERC drafted the code of conduct to "strike a careful balance" between giving customers "an effective remedy in the event anticompetitive behavior or other market abuses occur" and providing sellers "clearly-delineated" rules to follow. *Amendments to Blanket Sales Certificate*, 105 F.E.R.C. ¶ 61,217, at ¶ 2. Further, FERC designed the code "to provide market participants adequate opportunities to detect, and the Commission to remedy, market abuses." *Id.* at ¶ 6.

The Kansas antitrust statutes seek to proscribe all conspiratorial conduct intended or which tends to "prevent full and free competition" or which "advance[s], reduce[s], or control[s] the price ... to the consumer." Kan. Stat. Ann. § 50–112. This broad language is directed at prohibiting the very conduct FERC expressly proscribed in Order No. 644 pursuant to its authority under the NGA.

Finally, the NGA has equipped FERC to address the behavior the Kansas antitrust statutes seek to manage. According to the Ninth Circuit, FERC "possesses broad remedial authority to address anticompetitive behavior." *Cal. ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1015 (9th Cir.2004). Pursuant to its power under the NGA, FERC has the authority to investigate and gather data, to make any rules and regulations necessary to carry out the NGA's provisions, and to fashion appropriate remedies for violations of its regulations. 15 U.S.C. § 717m(a), § 717o; *Cal. ex rel. Lockyer*, 383 F.3d at 1015. Specifically, Congress gave FERC the authority to address claims of unreasonable and unjust rates and to set new rates. *See* 15 U.S.C. § 717d(a) (authorizing FERC to hold hearings to determine whether a rate is just and reasonable and, in the event it is not, empowering FERC to set a new rate that is just and reasonable). In addition, FERC has the power to suspend or revoke a certificate holder's certificate. *Amendments to Blanket Sales Certificate*, 105 F.E.R.C. ¶ 61,217, at ¶ 5; *see also Enron Power Marketing, Inc.*, 103 F.E.R.C. 61,343, at ¶ 1 (2003) (terminating the blanket marketing certificates of various Enron gas marketers for misconduct occurring during the years 2000–2001 pursuant to FERC's authority under sections five, seven, and sixteen of the NGA (15 U.S.C. §§ 717d, 717f, 717o)). Finally, FERC "has the authority under the NGA to require a jurisdictional seller to return unjust profits made in violation of its certificate authorization." *In re Amendments to Blanket Sales Certificates*, 107 F.E.R.C. ¶ 61,174, at ¶ 73 (2004); *Amendments to Blanket Sales Certificate*, 105 F.E.R.C. ¶ 61,217, at ¶ 5 (violating the code of conduct "may result in disgorgement of unjust profits ...."); *see also Consolidated Gas Transmission Corp. v. F.E.R.C.*, 771 F.2d 1536, (D.C.Cir.1985) (finding that FERC had the authority under sections seven and sixteen of the NGA to order retroactive

---

2. Section 14(a) of the NGA (15 U.S.C. § 717m(a)) provides:

 The Commission may investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person has violated or is about to violate any provisions of this chapter or any rule, regulation, or order thereunder ....

 Section 16 of the NGA (15 U.S.C. § 717o) provides:

 The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.

refunds to remedy violations of certificate conditions).

■ Not only does the NGA equip FERC with the tools to address anti-competitive behavior, but FERC actively is using these tools by holding conferences and hearings, collecting data, issuing orders, and remedying past violations. *See e.g., Price Discovery in Natural Gas & Electric Markets,* 104 F.E.R.C. 61,121, at ¶ 1 (2003) (holding conferences and collecting data concerning wholesale price formation issues with respect to natural gas); *Amendments to Blanket Sales Certificate,* 105 F.E.R.C. ¶ 61,217 (issuing Order No. 644 proscribing anti-competitive misconduct); *Enron Power Marketing, Inc.,* 103 F.E.R.C. ¶ 61,343, ¶¶ 1–2 (2003) (terminating various Enron gas marketers' blanket marketing certificates because they engaged in wash trades). The fact that the remedies available under federal law may not be as comprehensive as the remedies that otherwise would be available under state law is irrelevant. *See Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 584, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (recognizing that "[a] finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed"); *Transmission Agency of N. Cal.,* 295 F.3d at 931–32 (stating that it is not unlikely that a finding of preemption "may leave [a plaintiff's] state law claims unredressed"). Consequently, for all of these reasons, the NGA preempts state laws seeking to manage matters within the field of interstate natural gas sales for resale.

■ Although the Kansas antitrust statutes may not present an imminent collision with the NGA, they do present the prospect of interference with FERC's regulatory power, which, under *Schneidewind,* also justifies conflict preemption. Allowing Plaintiff's claim to go forward would disrupt FERC's ability to regulate comprehensively those areas within its jurisdiction and affect the uniformity of regulation in the wholesale natural gas market. Instead of bringing complaints to FERC's attention and allowing FERC to apply its unitary regulations, private parties could seek relief under differing state laws providing for various alternative remedies, thus causing a balkanization of national natural gas policy. Such a result contravenes Congress' intent to create a comprehensive and effective regulatory scheme that provides consumers a complete, permanent, and effective bond of protection from exploitation at the hands of natural gas companies and intrudes upon FERC's authority to regulate the interstate wholesale natural gas market. Accordingly, if Defendants' alleged misconduct falls within FERC's exclusive jurisdiction, Plaintiff's state antitrust claim is preempted under the NGA.

According to the Amended Complaint, Defendants' alleged false reporting to price indices, collusion, and wash trades artificially inflated and distorted wholesale gas prices which damaged Plaintiff because "[t]he companies that sold natural gas to plaintiff passed on the artificially inflated prices that they paid for natural gas." (Am. Compl. at 36.) All parties agree Defendants participated in the interstate natural gas market pursuant to FERC-issued blanket certificates. (Defs.' Mot. to Dismiss & Mem. in Support of Mot. to Dismiss at 14; Pl.'s Resp. to Defs.' Mot. to Dismiss Based upon Filed Rate & Federal Preemption Principles at 23.) These certificates authorized Defendants to sell natural gas in the interstate wholesale market but at the same time subjected Defendants' conduct to FERC monitoring to ensure that Defendants' market-based rates remained just and reasonable. FERC also maintained the authority to

condition Defendants' certificates and to promulgate new rules and regulations governing Defendants' conduct to ensure the competitiveness of the wholesale market. FERC's promulgation of its code of conduct in 2003 regulating the precise behavior alleged in Plaintiff's Complaint without any additional authorizing legislation demonstrates that power.

Moreover, Plaintiff's assertion that it is an "end user" outside of FERC's jurisdiction does not save its claim from dismissal based on preemption because, as this Court held in *Abelman*, the fact that a plaintiff may be an end user outside of FERC's jurisdiction is irrelevant if the misconduct alleged in the complaint "centers on misconduct in the wholesale gas market which is within FERC's exclusive jurisdiction." 408 F.Supp.2d at 1067. The alleged misconduct in this case is centered in the wholesale gas market because once Defendants received their blanket certificates authorizing them to make interstate wholesale sales they subjected themselves to FERC's jurisdiction over the wholesale market and because Defendants' alleged misconduct allegedly inflated and distorted wholesale natural gas rates, over which FERC has exclusive control. Because the NGA has granted FERC jurisdiction over the anti-competitive misconduct alleged in this case, Plaintiff's state antitrust suit is preempted. Accordingly, the Court will grant Defendants' Motion to Dismiss.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (2:05–CV–01331, Doc. # 32) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Amended Complaint is hereby dismissed with prejudice.